WHITE AND WILLIAMS LLP
Michael N. Onufrak  (MO 3693)
Liberty View
457 Haddonfield Road
Suite 400
Cherry Hill, New Jersey  08002
Phone (856) 317-3600
Fax    (856) 317-1342



**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

FLOORGRAPHICS, INC.
5 Vaughn Drive
Suite 200
Princeton, New Jersey  08540

                    Plaintiff

      v.

NEWS AMERICA MARKETING IN-STORE
SERVICES, INC.
20 Westport Road
Wilton, Connecticut  06897

          and

NEWS AMERICA, INC.
1211 Avenue of the Americas
5th Floor
New York, New York  10036

          and

NEWS CORPORATION OF AMERICA
1211 Avenue of the Americas
5th Floor
New York, New York  10036

          Defendants

CIVIL ACTION NO.

04 - 3500 (AET)

JURY TRIAL DEMANDED

**COMPLAINT IN CIVIL ACTION**

**A.**   **The Parties**

1.      Plaintiff, FLOORgraphics, Inc. ("FGI"), is a Pennsylvania corporation with its principal place of business at 5 Vaughn Drive, Suite 200, Princeton, New Jersey 08540.

2.      Defendant News America Marketing In-Store Services, Inc. ("NAMIS") is a Delaware corporation with its principal place of business at 20 Westport Road, Wilton, Connecticut, 06897.

3.      Defendant News America, Inc. is a Delaware corporation with its principal place of business at 1211 Avenue of the Americas, 5th Floor, New York, New York 10036.

4.      Defendant News Corporation of America is a Delaware corporation with its principal place of business at 1211 Avenue of the Americas, 5th Floor, New York, New York 10036.  Defendants are collectively identified herein as "News".

## B.      Venue and Subject Matter Jurisdiction

5.      Venue is proper in this district pursuant to 28 U.S.C. §1391(a).

6.      This Court has subject matter jurisdiction of this dispute under 28 U.S.C. §1332(c) because the parties are citizens of different states and the amount in controversy exceeds $100,000 exclusive of interest and costs.

## C.      FGI's Business

7.      FGI provides in-store marketing services on behalf of consumer packaged goods companies to promote awareness of their brands and increase product sales.

8.      FGI's business includes selling retail in-store floor advertising.  FGI contracts with manufacturers to place advertisements in the form of pressure sensitive decals on floors of retail stores such as those operated by Kmart Corporation ("Kmart").  FGI is the leading floor advertising firm in the nation, having developed the concept beginning in 1996.

-2-

### D.    FGI's Relationship and Contract With Kmart

9.    Effective March 18, 1998, FGI and Kmart entered into a Retail Advertising License Agreement ("the FGI/Kmart Agreement"), a copy of which is attached as Exhibit A, pursuant to which FGI agreed to provide floor advertising services to Kmart.

10.    The FGI/Kmart Agreement was extended by separate Addenda dated March 20, 2000 (which extended the FGI/Kmart Agreement through March 17, 2001) and August 28, 2000 (which extended the FGI/Kmart Agreement through March 17, 2002). Copies of the Addenda are attached hereto as Exhibit B.

11.    In entering into the FGI/Kmart Agreement, Kmart insisted upon a guaranteed first-year payment from FGI of $1.3 million, rising to $2 million thereafter with further escalators.

12.    In exchange for this significant financial commitment, FGI required from Kmart a commitment that the FGI/Kmart Agreement would continue beyond its original term. One reason FGI needed such a commitment was to assist FGI in obtaining financing to make the minimum committed payments.

13.    By letter of March 24, 1998, Kmart Divisional Vice-President Ken Kramer confirmed that Kmart's

> agreement is that if Floorgraphics is not in default of the contract and we want to continue to have floor advertising in our stores, we will extend your contract year-to-year and not do floor advertising with someone else.

> I realize you are making a big investment in your program and I understand your concerns, but you can tell your investors that if you are doing the job and we want floor advertising, we will extend your contract.

A copy of the Kramer letter is attached as Exhibit C hereto.

### E.    Defendants' Attempts to Destroy FGI

14.    Beginning in or about 1999, News commenced a deliberate and malicious campaign to destroy FGI so that it could control, among other things, the floor advertising market.

15.    Tactics used by News to destroy FGI included,  but were not limited to, (a) threats made to retailers not to do business with FGI at the risk of suffering a reduction in their payments on existing programs or having News stop providing all programs in their stores, and losing all income from those programs; (b) refusing to submit separate program bids to retailers and instead requiring that all in-store programs be contracted as a bundled bid; (c) creating bundled bids to retailers that allocated unrealistically large payments to the floor contract portion of the bids to induce retailers not to do business with FGI; (d) offering large payments to a retailer during the term of FGI's floor contract with such retailer to acquire rights to the programs in the future, a tactic specifically used in connection with the Kmart contract; and (e) including in its retail contracts a provision giving it a blanket right of first refusal on any new in-store marketing product idea.

16.    News has also engaged in unfair, improper and illegal conduct in their dealings with consumer packaged goods companies to destroy FGI, including, but not limited to, (a) offering to pay advertisers not to do business with FGI; (b) creating confusion in the marketplace by disseminating misinformation designed to induce advertisers not to do business with FGI; (c) misrepresenting the number of stores for which it provides floor programs; (d) spreading rumors that FGI is going out of business; (e) misrepresenting its right to use certain exclusive patent rights; and (f) misinforming advertisers that FGI has breached and would

-4-

continue to breach advertising contracts; (g) misinforming advertisers that FGI breached its retail agreements; and (h) bundling and tying sales of in-store products with sale of its FSI's (free standing inserts), a market in which News has market power.

17.     News has also attacked FGI directly by (a) breaking into FGI's password-protected computer system to acquire past and future contract information; (b) improperly acquiring confidential FGI documents; (c) hiring away FGI's sales representatives in an attempt to cripple FGI; and (d) sending press releases to the homes of FGI employees to break their spirit, making claims about the success of News' floor advertising program.

## F.     Defendants' Interference With FGI's Business and Contractual RelationshipWith Kmart

18.     As FGI's primary competition in the floor advertising market, News was aware of the FGI/Kmart Agreement.

19.     News approached Kmart in the fall of 2000 in an attempt to replace FGI. Kmart, knowing that it was bound by the FGI/Kmart Agreement, refused.

20.     News nonetheless  continued its efforts to induce Kmart to breach the FGI/Kmart Agreement and terminate its business relationship with FGI.  New exaggerated the portion of the total bid allocable to the floor advertising program given the revenues of the various programs in the bundled bid.  In July 2001, News succeeded in inducing Kmart to enter into a Master Agreement with NAMIS pursuant to which NAMIS, among other things, replaced FGI as the provider of floor advertising for Kmart.

21.     When FGI learned of the Master Agreement, FGI informed Kmart that Kmart's contract with NAMIS breached the FGI/Kmart Agreement.

22.     Kmart expressed concern to News about Kmart's liability to FGI in the context of FGI's continuing contract.

-5-

23.     News thereupon received from Kmart documents detailing FGI's confidential relationship with Kmart, knowing that the documents were confidential, and then agreed to indemnify Kmart against any expenses or damages arising out of any claims FGI might make against Kmart based on Kmart's decision to contract with NAMIS for the floor program.

24.     Defendants' conduct ruined FGI's contractual and business relationships with Kmart.

## COUNT I –TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

25.     FGI incorporates herein by reference Paragraphs 1 through 24 of this Complaint as if set forth at length.

26.     FGI and Kmart had a valid contract, namely, the FGI/Kmart Agreement

27.     FGI met all conditions and requirements of the FGI/Kmart Agreement, and Kmart was at all times fully satisfied with FGI's performance.

28.     News was aware of the FGI/Kmart Agreement at the time of its attempts to obtain the Kmart floor advertising program.

29.     Kmart, by its termination of FGI, breached the FGI/Kmart Agreement.

30.     News intentionally interfered with the FGI/Kmart Agreement and caused Kmart to terminate it.

31.     As described above, News intentionally committed wrongful acts and acted with malice and without justification or privilege for the improper purpose of invading and disrupting FGI's contractual relationship with Kmart.

32.     FGI has suffered damages as a result of the unlawful interference, including but not limited to loss of revenues, profits, enterprise value and additional damages which it will prove at trial.

33.     News' intentional and malicious conduct was designed to destroy FGI's contractual relationship with Kmart as well as its entire business and warrants the imposition of punitive damages against News.

**WHEREFORE**, FGI demands judgment against defendants in an amount in excess of $100,000, plus punitive damages, costs, interest and such other relief as the Court deems appropriate.

## COUNT II – INTERFERENCE WITH BUSINESS RELATIONSHIP/PROSPECTIVE CONTRACTUAL RELATIONS

34.     FGI incorporates herein by reference Paragraphs 1 through 33 as if fully set forth at length.

35.     Through its several years of dealing with Kmart and providing floor advertising services to Kmart, FGI established a valid, advantageous, profitable business relationship with Kmart, and an expectancy that the relationship and its mutual benefits would continue.

36.     News was aware of FGI's business relationship with Kmart.

37.     News intentionally interfered with that relationship and caused the breach and termination of the relationship.

38.     FGI has suffered damages as a result of News' interference, including but not limited to loss of revenues, profits, enterprise value and additional damages which it will prove at trial.

39.     News' intentional and malicious conduct was designed to destroy FGI's relationship with Kmart as well as its entire business and warrants the imposition of punitive damages against defendants.

**WHEREFORE**, FGI demands judgment against defendants in the amount in excess of $100,000, together with punitive damages, costs, interest and such other relief as the Court deems appropriate.

**WHITE AND WILLIAMS LLP**

By: _____

Michael N. Onufrak

7/18/04

## CERTIFICATION PURSUANT TO LOCAL RULE 11.2

I, Michael N. Onufrak, Esquire, hereby certify that the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

_____
Michael N. Onufrak

Dated: July 19, 2004

## RETAIL ADVERTISING LICENSE AGREEMENT

**This Agreement** is made this 18th day of March, 1998 by and between **FLOORGRAPHICS, INC.**

("*FGI*"), a Pennsylvania Corporation, with its corporate office located at 1420 Walnut Street, Suite 1010,

Philadelphia, PA 19102, and **Kmart**, a Michigan corporation ("*Operator*") with its principal office at 3100

West Big Beaver Road, Troy, Michigan 48084

### BACKGROUND

(A)     FGI has developed the concept for an advertising program utilizing pressure sensitive decals affixed to the floor in various locations in retail stores ("Decal Program");

(B)     Operator operates a chain of retail outlets;

(C)     Operator desires to participate in FGI's Decal Program and FGI desires to obtain a license from Operator to have access to and affix decals to the Operator's floors at various Operator's locations; and,

(D)     The parties enter into this Advertising License Agreement ("Agreement") to memorialize their respective agreements and understandings.

(E)     Operator has not, and will not, enter into any agreements with any other person(s) or entities which will interfere or restrict with FGI's ability to perform under this agreement and obtain advertising contracts for the placement of the Decals at Operator's locations.

NOW THEREFORE, the parties hereto, for their respective successors and assigns, and intending to be legally bound, with the foregoing clauses included as a substantive part hereof, do hereby agree as follows:

### 1. DECAL PROGRAM:

Operator hereby agrees to participate in FGI's Decal Program at its stores located at the locations set forth in the attached Schedule "A", including any additional stores that Operator may designate in its sole discretion, which may be hereafter opened during the term of this Agreement ("Locations"). During the term of this Agreement, Operator will permit FGI to furnish and install, at FGI's cost, up to thirty (30) decals per store per month with a maximum size of 19" x 25" each. During the term of this Agreement,

Operator will use reasonable efforts not to allow the installation of any decals on the floors of its stores, as listed in schedule A, which advertise any products or services except as are specifically authorized by FGI. Operator may install decals portraying "non-competing private label products and in-store promotions" which may be contracted for by Operator with FGI and produced, installed, maintained, and removed by FGI at a cost to Operator calculated at FGI's actual costs (including 15% overhead and intangible allocation).

"Non-Competing Products" are products in categories where there is no advertising contract previously entered into for the four week advertising cycle (as determined by FGI) in question.

"Private Label Products" are defined as "Kmart private brands".

"In store promotions" are events, services, and products (except those products which are the subject of FGI's marketing efforts).

### 2. COMPENSATION:

(A)     FGI will enter into written contracts with advertisers whereby it will be paid an advertising fee ("Fees") for placing floor decals in Operator's various retail store locations. As compensation for the License herein granted to FGI, Operator shall receive the greater of twenty-five percent (25%) of FGI's gross fees (less advertising agency commissions, if any) collected from advertisers for decals placed at each of Operator's Locations as its license fee or the minimum payments set forth in paragraph 2 (B) and (C) below ("License Fee").

The License Fee shall be payable by FGI to Operator within fifteen (15) days after the end of each calendar quarter during the term of this Agreement

based upon all Fees received by it during the quarter. The License Fee payment shall be accompanied by an itemization showing the Fees received by FGI from each advertiser participating in the Decal Program at the Locations and allocated on a per store basis. Upon Operator's written request, FGI shall furnish all reasonable supporting documentation for such License Fee requested, including without limitation, invoices, checkstubs, bank statements, advertising contracts. and so forth. Operator shall have the right to inspect FGI's relevant business records upon five (5) days prior written notice to FGI in order to ascertain the correctness of any payment. In the event there is a discrepancy between the License Fee FGI paid to Operator and the License Fee that should have been paid to Operator in accordance hereof, FGI will correct such discrepancy within twenty (20) days and if such discrepancy shall exceed more than two percent (2%) of the payment made to Operator, FGI shall within ten (10) days of receiving written notice of such discrepancy and Operator's costs, reimburse Operator for reasonable costs to Operator for the audit and examination rendered by Operator's representative(s). FGI must maintain all books and records with regard to payment of any License Fee due hereunder for a period of four years after each payment.

(B) FGI guarantees that Operator will receive License Fees in the minimum amount of One Million Three Hundred Thousand ($1,300,000.00) Dollars in the 1998 calendar year. Accordingly, FGI shall:

(i) Pay to Operator as the first quarterly payment due on April 15, the sum of Three Hundred and Twenty Five Thousand Dollars ($325,000.00) on or before the date of the first installation of any decals (as provided for herein, and not including the installation of any decals pursuant to any test program) (which date is hereafter referred to as the "Date of First Installation");

(ii) Pay to Operator the minimum sum of Three Hundred and Twenty Five Thousand Dollars ($325,000.00) on License fee payment date.

(C) FGI guarantees that Operator will receive License Fees in the minimum amount of Two Million ($2,000,000.00) Dollars in 1999. Accordingly, FGI shall pay to Operator the minimum sum of Five

Hundred Thousand Dollars ($500,000.00) on Licensing fee payment date.

(D) The payments described in (B) and (C) above are the minimum payments to be applied against the License Fees due to Operator each calendar quarter based on FGI's gross sales collected from advertisers during each quarter for decals placed at the Operator's locations listed on Schedule A. To the extent the License Fee payable to Operator as provided in paragraph 2 (A) exceeds the minimum License Fee payable under paragraphs 2 (B) and (C) for each calendar quarter, FGI will pay such excess above the minimum to Operator each calendar quarter during the term of this Agreement. In no event will any deficiency in the gross sales received by FGI in any calendar quarter be used to reduce the future guaranteed minimum payments provided for in this Agreement. So long as Operator does not terminate this Agreement without Cause, Operator is not obligated to repay to FGI any minimum payments made under (B) and (C) above.

## 3. TERM OF THE CONTRACT:

### (A) Termination Upon Expiration of Term:

The term of this contract shall commence on the date of execution of this Agreement and shall terminate two (2) years from the date thereof ("Term") therefrom unless terminated as hereinafter provided.

### (B) Termination for Breach:

Pursuant to paragraph 12 hereof, either party may terminate this Agreement and commence any action for damages in the event of a default as defined below.

### (C) Effect of Termination:

(i) During the term of this Agreement, and for a period of three (3) years thereafter, Operator shall keep confidential all information received from FGI, including without limitation the terms, conditions, and rates contained in this Agreement, contained in FGI's advertising agreements, and the information contained in FGI's financial information and records. Operator shall only allow those individuals who have a need to review such information and documentation to have access to same, who shall also be bound by this provision. All of these individuals must be employed by Operator or be Operator's attorneys or accountants.

(ii) Operator shall comply with, and shall allow FGI to honor and comply with, any written advertising

Ver. 03/18/98   7:28 PM

contracts in existence at the date of termination for the placement of decals at Operator's locations, for a period not to exceed three months from the date of termination subject to the payment of the License fee as provided for herein.

(iii) The provisions of paragraphs 2(A), 3(C), and 10 shall survive a termination of this Agreement, notwithstanding the reason therefor.

**(D) Contract Renewal:**

(i) FGI and Operator agree to provide for extension of the contract term through a procedure of annual contract renewal.

(ii) Nine months prior to the contract's expiration of term (as measured by the original term or the current term created by the most recent contract renewal), FGI and Operator will meet and decide whether to renew the contract.

(iii) Contract renewal extends the term of the contract for one additional year, added at the end of the existing contract term.

(iv) The minimum payment due Operator for each additional year added to the contract will be the greater of:

(1) 125% of the minimum payments due to Operator during the Operator's current fiscal year; or

(2) 50% of the actual total license fees paid by FGI to Operator during the Operator's prior fiscal year.

(v) The payment schedule for minimum payments owed to Operator entered into as a result of any such renewals will be as in 2(C) above, adjusting the "year" date in the calendar appropriately: April 1 of the additional fiscal year; July 1; October 1; and January 15.

(vi) In no event is this procedure of Contract Renewal to be construed on behalf of either FGI or Operator to create a right of automatic contract renewal.

**4. INSTALLATION AND MAINTENANCE OF DECALS:**

(A) FGI will upon fourteen (14) days prior written notice install, service and/or remove all decals, during normal business hours and shall use its best efforts not to in any way interfere with Operator's business at each specific location. In order to comply with the commitments which it makes with its advertisers, FGI shall be entitled to determine the location and the length of time when any decal will remain in place, except as otherwise provided for herein. Operator's floors remain the property of Operator. All advertising is subject to the prior approval of Operator, which approval shall not be unreasonably withheld, and which approval shall be deemed given, if written notice of disapproval is not received by FGI within seven days of the date request for approval is received by Operator. Notwithstanding the foregoing, no decal advertising or promoting liquor, tobacco, firearms, or condoms may be placed without the written consent of Operator.

(B) FGI shall be solely responsible for any required maintenance or replacement of the decal resulting from any and all causes other than the willful misconduct or gross negligence of Operator. FGI warrants and represents that the decals will not be adversely affected through the use of normal floor cleaning substances and machinery. Upon discovery, Operator shall promptly inform FGI of any and all decals in need of repair or replacement. FGI shall perform periodic inspections at various locations to determine whether maintenance or replacement of the decals is necessary.

(C) FGI hereby warrants and represents that such decals comply with all applicable governmental authorities with jurisdiction over all matters hereof and that FGI has received all required consents from the advertisers to use the logos in the decals. In the event any such decal is not in compliance with any such governmental authorities, FGI shall be responsible to immediately remove or replace such decals with decals that do comply therewith.

(D) FGI shall be responsible for any and all damage to the tile and/or original floor materials, fixtures, merchandise or otherwise, whether incidental or consequential thereto.

(E) The Operator agrees to give FGI prompt notification in writing of any claims or damages.

**5. GOVERNING LAW:**

This Agreement shall be governed by, interpreted, and enforced according to the laws of the state of Michigan.

Page No. 3

Ver. 03/18/02 - 2:28 PM

## 6. SEVERABILITY:

In the instance that any provision of this Agreement shall be held invalid, illegal or unenforceable, the validity, legality and enforceability of that provision and other situations and of the remaining provisions shall not, in any way, be affected thereby. If performance by either FGI or Operator of any obligation under any provision of this Agreement contravenes a law of any state or jurisdiction where such performance is to take place, the performance of such obligation shall be effected instead in accordance with the requirements of such law, but only to the extent that the provision requiring such performance contravenes such law and only to the extent and while each law is deemed or held to be valid and applicable to such performance.

## 7. WAIVERS:

Neither party hereto shall be deemed to have waived its rights or any default by the other unless such waiver is specific and in writing. Failure of either party at any time to require full performance thereof at any time thereafter, and any waiver by either party of a breach of any such provision shall not constitute a waiver of any subsequent breach thereof or nullify the effectiveness of such provision.

## 8. NOTICES AND APPROVALS:

All notices, authorizations, consents and approvals provided for herein shall be in writing where so provided for herein and shall be deemed given:

(i) On the date delivered personally or by messenger;

(ii) On the date received by overnight courier service; or

(iii) Three days after the date mailed by certified mail, postage prepaid, in any case sent to the appropriate party at its address listed below or to such other address as is furnished in writing from time-to-time by either to the other party in accordance herewith;

IF to FGI:

FLOORgraphics, Inc.
Cherry Tree Corporate Center (4th Floor)
Cherry Hill, New Jersey 08002

With a Required Copy to:

David M. Ginsberg, Esquire
1420 Walnut Street, #1006
Philadelphia, PA 19102

IF to OPERATOR:

Kmart
3100 West Big Beaver Road
Troy, Michigan 48084
Attn: Ken Kramer

## 9. BINDING EFFECT:

This Agreement represents the entire agreement between the parties concerning the subject thereof, supersedes any oral or written proposals or writing of any kind or nature. This Agreement cannot be nullified, altered or modified except by a writing signed by both parties and making specific reference to this Agreement.

## 10. INSURANCE AND INDEMNIFICATION:

FGI will furnish Operator with a certificate of insurance providing limits of Two Million Dollars ($2,000,000.00) per injury, Four Million Dollars ($4,000,000.00) aggregate. Operator shall be named as an additional insured exclusively with respect to FGI's Decal Program. Such certificate shall provide that no expiration, cancellation, or material change in the insurance evidenced thereby shall be effective unless thirty (30) days unconditional notice of such expiration, cancellation, or material change shall have been given to Operator. FGI shall not be responsible for the negligent or willful misconduct of Operator or of third parties.

Each party hereto shall completely defend, indemnify, and hold harmless the other from each and every claim, cause of action, lawsuit, and/or liability (hereafter "*Claim*") arising from any occurrence, accident, or transaction or other Claim alleging negligence or other conduct which would constitute a breach of such party's obligations hereunder and including from each any Claim in tort asserting that the non-indemnifying party is secondarily or contributorily liable to the indemnifying party as a result of the actions or inaction of the indemnifying party.

Under the provisions of this paragraph 10, any person seeking to enforce such rights (a "Claiming Person") shall give written notice of such matter to the party against whom enforcement of such rights is

sought (the "Indemnifying Party"). The Claiming Person shall cooperate with the Indemnifying Party in the negotiation, compromise, and defense of such matter. The Indemnifying Party shall be in charge of and control such negotiations, compromise and defense and shall have the right to select counsel with respect thereto, provided that the Indemnifying Party shall promptly notify the Claiming Person of all developments in the matter. In no event shall the Claiming Person compromise or settle any such matter without the prior consent of the Indemnifying Party, which shall not be bound by any such compromise or settlement absent its prior consent, which shall not be unreasonably withheld or delayed.

## 11. OBTAINING ADVERTISERS:

FGI shall be solely responsible for obtaining advertisers for the Decal Program and Operator shall not have any obligation to obtain or assist FGI with obtaining advertisers.

## 12. DEFAULT REMEDIES: Any of the following occurrences, conditions or acts by FGI or Operator shall constitute a default ("Default") under this Agreement: (a) failure to observe or perform any other provision of this Agreement within thirty (30) days after receipt of written notice from the other party specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such (30) day period, the defaulting party shall have such longer period as is reasonably necessary to cure the default, so long as such party proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion; (b) adjudication as bankrupt or insolvent, or the appointment of a receiver, trustee in involuntary bankruptcy or other, similar officer to take charge of any substantial part of the business of a party, which proceeding is not dismissed within one hundred twenty (120) days after it is begun;

After the occurrence of a Default, the non-defaulting party shall have the right, as permitted by

law to terminate this Agreement pursuant to paragraph 3 hereof.

## 13. ASSIGNMENT:

Either party to this Agreement with the written permission of the other, which permission shall not be unreasonably withheld, shall have the right to assign its rights and obligations under this Agreement, except however, no permission shall be required and each party shall have the free right to assign its rights and obligations under this Agreement to a successor, subsidiary, parent company, affiliated entity or to a successor to substantially all of the assets of the parties or otherwise pursuant to an acquisition, merger, stock sale, asset sale, or initial public offering.

## 14. MERGER:

This contract sets forth all of the terms, conditions and agreements of the parties and supersedes any prior oral or written agreements, negotiations or representations of the parties except as set forth herein.

## 15. RELATIONSHIP OF PARTIES:

Nothing in this Agreement shall be construed to create a partnership, joint venture, employer-employee or landlord-tenant relationship between the parties hereto and neither party shall make any representations tending to create any apparent agency, employment relationship, partnership, joint venture or tenancy. It is intended by the parties hereto that the relationship created by this Agreement is that of independent contractor and client, granting FGI an exclusive license to affix decals to the floor of Operators various retail locations, it being understood that FGI's business is separate and apart from any business that may be operated by Operator and that FGI may perform similar services on behalf of any other business other than Operator which other business may be competitive with Operator.

IN WITNESS WHEREOF, the parties have set their hands and seals on the date first written above.

ATTEST:

_Kaitleen Padden_
_____

ATTEST:

_____

FLOORGRAPHICS, INC.

_Gregory Cee_
Officer
_____

OPERATOR

_Gary Ruffing_
Vice President

Ver. 03/19/02   2:29 PM

# ADDENDUM

This Addendum is made this 20 day of March, 2000 to a certain Retail Advertising License Agreement entered into on March 18, 1998, by and between FLOORgraphics, Inc. ("FGI"), a Pennsylvania corporation, and Kmart ("Kmart"), a Michigan corporation, in which Kmart agreed to participate in FGI's National Floor Advertising Program.

Whereas FGI and Kmart recognize that it is mutually advantageous that Kmart's stores continue to be presented as available to prospective advertisers (especially advertising agencies) as they budget future media expenditures for Floor Advertising according to calendar or fiscal year schedules (thus encompassing periods as much as two years hence);

And whereas the Agreement expires on March 17, 2000, and FGI and Kmart mutually desire to extend the Term of the Agreement;

In consideration of the mutual covenants, promises and agreements contained in the Agreement, which are hereby incorporated herein by reference, the parties do hereby mutually agree as follows:

> **Upon execution of this Addendum, the Term of the Agreement will be one (1) year. All other terms of the Agreement currently in effect will remain the same.**

IN WITNESS WHEREOF, the parties have set their hands and seals on the date first written above.

ATTEST:   **FLOORgraphics, Inc.**

_____   3/21/00
                          Date

ATTEST:   **Kmart**

_____   3/20/00
                          Date

FGI Agreement Extend

# ADDENDUM

This Addendum is made this _28_ day of August, 2000 to a certain Retail Advertising License Agreement entered into on March 18, 1998, by and between FLOORgraphics, Inc. ("FGI"), a Pennsylvania corporation, and Kmart ("Kmart"), a Michigan corporation, in which Kmart agreed to participate in FGI's National Floor Advertising Program.

Whereas the Agreement, as amended, expires on March 17, 2001;

Whereas the Agreement provides for its extension in Section 3(D);

And whereas FGI and Kmart desire to extend the Agreement;

In consideration of the mutual covenants, promises and agreements contained in the Agreement, which are hereby incorporated herein by reference, the parties do hereby mutually agree as follows:

> **Upon execution of this Addendum, the term is extended to March 17, 2002.**

> **For the period of the extended term, License Fees continue to be guaranteed by FGI in the minimum annual amount of Two Million Dollars ($2,000,000).**

> **All other terms of the Agreement currently in effect remain the same.**

IN WITNESS WHEREOF, the parties have set their hands and seals on the date first written above.

ATTEST:  **FLOORgraphics, Inc.**

_Richard G. Rupp_        _Aug 28 '00_
                          Date

ATTEST:  **Kmart**

_Gary Ruffing_        _Aug 28 00_
                       Date

FGI Agreement Extend

# ADDENDUM

This Addendum is made this 20 day of March, 2000 to a certain Retail Advertising License Agreement entered into on March 18, 1998, by and between FLOORgraphics, Inc. ("FGI"), a Pennsylvania corporation, and Kmart ("Kmart"), a Michigan corporation, in which Kmart agreed to participate in FGI's National Floor Advertising Program.

Whereas FGI and Kmart recognize that it is mutually advantageous that Kmart's stores continue to be presented as available to prospective advertisers (especially advertising agencies) as they budget future media expenditures for Floor Advertising according to calendar or fiscal year schedules (thus encompassing periods as much as two years hence);

And whereas the Agreement expires on March 17, 2000, and FGI and Kmart mutually desire to extend the Term of the Agreement;

In consideration of the mutual covenants, promises and agreements contained in the Agreement, which are hereby incorporated herein by reference, the parties do hereby mutually agree as follows:

> **Upon execution of this Addendum, the Term of the Agreement will be one (1) year. All other terms of the Agreement currently in effect will remain the same.**

IN WITNESS WHEREOF, the parties have set their hands and seals on the date first written above.

ATTEST: **FLOORgraphics, Inc.**

_(signature)_ 3/21/00
Date

ATTEST: **Kmart**

_(signature)_ 3/20/00
Date

FGI Agreement Extend

# ADDENDUM

This Addendum is made this 28 day of August, 2000 to a certain Retail Advertising
License Agreement entered into on March 18, 1998, by and between FLOORgraphics,
Inc. ("FGI"), a Pennsylvania corporation, and Kmart ("Kmart"), a Michigan corporation,
in which Kmart agreed to participate in FGI's National Floor Advertising Program.

Whereas the Agreement, as amended, expires on March 17, 2001;

Whereas the Agreement provides for its extension in Section 3(D);

And whereas FGI and Kmart desire to extend the Agreement;

In consideration of the mutual covenants, promises and agreements contained in the
Agreement, which are hereby incorporated herein by reference, the parties do hereby
mutually agree as follows:

>    **Upon execution of this Addendum, the term is extended to March 17, 2002.**

>    **For the period of the extended term, License Fees continue to be guaranteed
>    by FGI in the minimum annual amount of Two Million Dollars ($2,000,000).**

>    **All other terms of the Agreement currently in effect remain the same.**

IN WITNESS WHEREOF, the parties have set their hands and seals on the date first
written above.

ATTEST:    **FLOORgraphics, Inc.**

_Richard G. Ruth_          _Aug 28 '00_
                              Date

ATTEST:    **Kmart**

_Gary Ruffing_           _Aug 28 00_
                          Date



March 24, 1998

Kmart Corporation
Resource Center
3100 West Big Beaver Road
Troy MI 48084-3163

George Rebh
Executive Vice President
FLOORgraphics, Inc.
Cherry Tree Corporate Center
Cherry Hill, NJ 08002

Dear George:

In response to your letter, the contract calls for a meeting between Kmart and FLOORgraphics to discuss whether to renew the contract. We were not able to include your language for automatic renewal because we may decide not to continue with floor advertising in the future. However, I have reviewed with Gary Ruffing our discussions on this point, and our agreement is that if FLOORgraphics is not in default of the contract and we want to continue to have floor advertising in our stores, we will extend your contract year to year and not do floor advertising with someone else.

I realize you are making a big investment in your program and I understand your concerns, but you can tell your investors that if you are doing the job and we want floor advertising, we will extend your contract.

Sincerely,

Ken Kramer
Divisional Vice President
Merchandise Presentation

*Ken:*
*Thank you.*

*3/27/98  George Rebh*
*GEORGE REBH*
*EXECUTIVE VICE PRESIDEN*
*FLOORgraphics, Inc.*

KMART
FILE

# MEMORANDUM

**TO:** KEN KRAMER
**FROM:** GEORGE REBH     *George Rebh*
**RE:** KMART, FLOORgraphics AGREEMENT 3/18/98
**DATE:** MARCH 20, 1998

First, we were pleased on Wednesday to conclude the Agreement between Kmart and FLOORgraphics to create a floor advertising program in Kmart. We appreciate your support in making this happen.

As you know, in the final negotiations for the Agreement, you requested that we increase the guaranteed minimum payment from $250,000 to $1.3 Million for the remainder of 1998 and an additional $2 Million for 1999. These amounts, plus other Kmart-specific investments we will be making to develop our program, will produce losses for us. In consideration of these investments and our new financial risks, we had requested an automatic annual renewal to assure we could continue to develop floor advertising in Kmart into the future. You told us Kmart could not agree to an automatic renewal, and Kmart inserted the final language of the renewal procedure in the Agreement.

We are concluding our first investment round as Richard discussed with your CFO. Our investors have reviewed the final language of the Agreement and are requesting a letter from our program supervisor reflecting our final discussions on conditions for contract extensions. What you and I agreed was that, if FLOORgraphics made the required payments, was not in default of the Agreement, and Kmart wanted to continue with floor advertising, our contract would be renewed annually. If Kmart management decides it no longer wants floor advertising (as distinct from pursuing floor advertising itself or with another provider) at some point in the future, our Agreement will be allowed to expire, and that is a risk we bear. But, as the creator of this new medium, we will work long and hard to make sure that does not happen!

Accordingly, may we receive a letter from you for my acknowledgment which recounts our final discussions that, upon expiration of the term or succeeding terms, if we are not in default of our Agreement and if Kmart elects to continue with floor advertising, our Agreement will be extended by Kmart?

Thank you, Ken, and we look forward to justifying your confidence in us and our program.



Advertising that Closes the Sale™