# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **FLOORGRAPHICS, INC.,** | : | **Civil Action No. 04-3500 (AET)** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | **M E M O R A N D U M** |
| **NEWS AMERICA MARKETING** | : | **O P I N I O N** |
| **IN-STORE SERVICES, INC., et al.,** | : | |
| | : | |
| **Defendants.** | : | |
| _____ | : | |

**HUGHES, U.S.M.J.**

## I.    INTRODUCTION

These matters have come before the Court by Defendants' News America Marketing In-Store Services, Inc., et al. ("Defendants") for Motions *in Limine* to exclude the trial testimony of Floorgraphics, Inc.'s ("Plaintiff") proposed Experts Willard Bishop [dkt. entry no. 148]; William Carrington [dkt. entry no. 149]; Luke Cats [dkt. entry no. 150]; Edward McLaughlin [dkt. entry no. 151]; John Wills [dkt. entry no. 152]; and Paul Farris [dkt. entry no. 152], returnable October 15, 2007.  Plaintiff filed opposition to all of these motions on September 17, 2007.  Defendants replied on October 1, 2007.  The Court conducted oral argument on November 16, 2007.[1]

For the reasons stated herein, Defendants' motions with regard to Edward McLaughlin and Willard Bishop are granted.  Defendants' motions with regard to Luke Cats, William Carrington, John Wills, and Paul Farris are denied.

---

[1] The parties agreed that in-court testimony from any of the proposed experts was unnecessary.  *See Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999)  (an *in limine* hearing is not required whenever a *Daubert* objection is raised to a proffer of expert evidence. . . [w]hether to hold a hearing "rests in the sound discretion of the district court").

## II.    BACKGROUND AND PROCEDURAL HISTORY

Plaintiff and Defendants compete in the in-store marketing industry.  They both enter into exclusive contracts with retail and wholesale grocery stores, drug stores, and mass merchandisers ("retailers") to install ads on the shelves and floor of the retailers' stores.  Both Plaintiff and Defendants then sell and place ads on the shelves and floor of their stores.  They also sell and place ads for consumer packaged goods manufacturers (CPGs) in those retailers' stores.

In this lawsuit, Plaintiff alleges that Defendants engaged in a variety of illegal and tortious practices designed to oust Plaintiff from its retailer contracts, poison Plaintiff's relationships with CPG advertising clients, and run Plaintiff out of business.  Defendants' conduct allegedly includes providing false and misleading information about Plaintiff's business and products to clients.  Plaintiff also alleges Defendants unfairly structured its bids to retailers in order to falsely portray Defendants' bids as more attractive than Plaintiff's.  Plaintiff also alleges tortious interference because Defendants "allegedly hacked into" its password-protected website.  Defendants dispute each of Plaintiff's allegations.

In order to prove its case, Plaintiff has attempted to offer these six witnesses as experts pursuant to Federal Rule of Evidence 702.   Defendants objected to every one of Plaintiff's proposed experts with these five *in limine* motions.  Each expert will be discussed in turn.

### A.    William Carrington

Dr. Carrington is being offered as an expert to discredit Defendants' 2002 audit that measured placement compliance of Plaintiffs, specifically by comparing Plaintiff's contractual obligations to place floor advertisements in supermarkets and other retail stores against Plaintiff's actual performance in doing what it was contracted to do.  Here, Defendants argue that

Dr. Carrington is not qualified pursuant to Federal Rule of Evidence 702.

Dr. Carrington is an accomplished economist and statistician with a plethora of professional and academic experiences. He received his doctorate degree in economics from the University of Chicago and his Bachelor of Arts degree in economics from Duke University. (Carrington Rep. at ¶ 4.) In addition, he has taught economics and statistics at both the graduate and undergraduate levels at both the University of Chicago and Johns Hopkins University. (Pl.'s Carrington Opp. Br. at 3.) Dr. Carrington also worked for two years as an economist for the Bureau of Labor Statistics, where he developed questionnaires and other survey methodology for the Bureau's data collection programs. (Carrington Rep. at ¶ 4.) Dr. Carrington has published widely on economic analysis in various journals on a variety of industries, principally applying economic and statistical principles to the context of labor economics. (Pl.'s Carrington Opp. Br. at 4.)

B.    Luke Cats

Mr. Cats is being offered as an expert to determine whether Defendants "gained unauthorized access to the content of a password-protected website owned by Plaintiff that contained pictures of floor ads that Plaintiff either had placed in past advertising cycles or intended to place in future cycles. (*See* Cats Rep. at 1.) Plaintiff provided Mr. Cats with a CD containing four files that purported to be copies of the original data that resided on Plaintiff's computer network. *Id.* at 3.

The first file is a compressed archive of Plaintiff's web server logs for the period from September 8, 2003 to September 8, 2004. *Id.* at 3. Mr. Cats, relying on this data, concluded that Defendants accessed Plaintiff's password-protected website eleven (11) times on seven (7) days

from October 6, 2003 through January 13, 2004 and viewed images of the floor ads.  *Id.* at 7-8; 12.  Furthermore, Mr. Cats concluded that Plaintiff's website must have been password-protected.  *Id.* at 5; 7-8; 12.  Mr. Cats further opined that the investigation that Defendant conducted after it learned of from Plaintiff about the access to Plaintiff's website was deficient. *Id.*

Mr. Cats did not create the CD that was provided to him by Plaintiff.  Mr. Cats marked the CD "for identification purposes with the client property number 0203-0004; CP000001," made an "exact copy" of the CD, "downloaded the CD to a server," and stored the Plaintiff's provided original in a safe.  (*See* Cats Rep. at 3-4.)  Cats relied solely upon the deposition testimony of Michael Povoski, a former employee of Plaintiff.  (*See* Def.s' Cats Br. at 3.)  Mr. Cats did not discuss with Mr. Povoski the steps that Mr. Povoski took to create the CD.  *Id.*

In Mr. Cats' report, he ran a program to compare the data in the "apache-logs-040908-all.tar.gz" file with the data that Mr. Povoski had saved to the Plaintiff's network in September of 2004.  (Cats Rep. at 4.)  The data matched, which led Mr. Cats to believe that the file on the CD "is a complete and accurate copy of the compressed log file saved to the network." *Id.*  Mr. Cats did nothing, however, to ensure or confirm that the data on the network was itself unaltered and complete.  (*See* Cats Dep. at 56-57.)  Mr. Cats conceded that the logs could have been altered before he received them.  *Id.* at 54-55.

The second file is called "illegal-access.txt."  It purports to be an excerpt from the apache-logs file that contained all of the "logs files showing access to Plaintiff's password protected site" from an IP address that Mr. Cats links to Defendant.  (Def.s' Cats Br. at 4.)  He submitted this program without running a program to compare the data in the "illegal-access.ext"

4

file with the data that Mr. Povoski previously saved to the Plaintiff's network.  (Cats Dep. at 64.)
After Mr. Cats read the report of Defendants' computer expert, he did perform the comparison.
Mr. Cats did not conduct "any analysis to determine whether there had been any alteration or
modification to the data on that log prior to it being saved." *Id.* at 64-65.  Mr. Cats also noted that
the data on the file could have been manipulated "fairly easily".  *Id.* at 65.

The third and fourth files are (1) a file called "login-screen.jpg" that purports to be a
screen capture of a web browser requesting the website www.floorgraphics.com/clients and (2) a
file called "old-clients-website.tar.gz," which Mr. Cats identified as a compressed archive of the
entire contents of the www.floorgraphics.com/clients website.  (Cats Rep. at 3.)  Mr. Cats did not
run a comparison program on these files to confirm that the underlying data from the network
was both unaltered and complete.  (Def.s' Cats Br. at 5.)  Mr. Cats opines that Defendants "could
have downloaded and saved files in a short period of time, and subsequently printed or e-mailed
the files to others while offline." (Cats Rep. at 9.)  He could not, however, determine from the
logs what the user did with the information.  (Cats Dep. at 74.)  Mr. Cats also conceded that he
did not have "any idea" of the types of images that Defendant allegedly viewed on the website,
but rather he simply "reconstructed" his conclusions from the admittedly unverified logs, instead
of actually viewing the web pages that formed the basis of those conclusions.  (Def.s' Cats Br. at
6.)

Mr. Cats also concludes that Plaintiff's website was password-protected because the data
on the CD reflected a "pop-up box requesting a user name and password" to enter Plaintiff's
website.  (Cats Rep. at 5.)  Mr. Cats, however, did not determine the adequacy of the password
protection of Plaintiff's website and did not independently conclude that the alleged access by

Defendants was "unauthorized". (Def.s' Cats Br. at 6; Cats Dep. at 48-50; 74-75.)

Mr. Cats also criticized the internal investigation that Defendants conducted after their management was informed that someone with Defendants had allegedly accessed Plaintiff's website. (Cats Rep. at 11-12.) Mr. Cats conceded, however, that he did not know much about the circumstances surrounding Defendants' investigation and that his initial conclusions about the investigation were inaccurate because Defendants had actually completed at least one of the investigatory steps that Mr. Cats faulted them for not taking. (Cats Dep. at 126-28.)

Although Mr. Cats did not assess the reliability of four underlying files that were provided to him from Plaintiff, there is uncontradicted evidence from Plaintiff's head of information technology, Mr. Povoski, that shows that Plaintiff's computer logs were unaltered and entirely reliable. (Pl.'s Cats Opp. Br. at 1.) Also, Defendants' own computer expert, Mr. Brill, admitted that there was no evidence that the server logs and files were altered or manipulated. *Id.* Defendants' expert further opines that, assuming the evidence is authentic, Defendants accessed Plaintiff's password-protected website on the dates and times that Mr. Cats identified. *Id.* Furthermore, in response to requests for admissions, (1) Defendants admits the it was never given permission to access Plaintiff's computers, (2) admits that the internet address of the computer that accessed Plaintiff's password-protected site was owned by Defendants, and (3) claims that despite an internal investigation, Defendants cannot admit or deny whether Defendants' computers accessed the password-protected areas of Plaintiff's website. *Id.* at 2.

C.   John Wills

Mr. Wills was retained by Plaintiff's counsel and asked to review relevant information pertaining to the claims in the case and quantify damages, if any, related to such claims. (Wills

Rep. at 1.)  Moreover, Mr. Wills was asked to compute an estimate of such losses if his analyses demonstrated lost profits attributable to the Defendants.  *Id.* at 1-2.  Mr. Wills, who assumed that Defendants were found liable on every count in the Complaint, concluded that the combined effect of the improper conduct by Defendant alleged in those counts "negatively impacted the sales of Plaintiff" between 2003 and 2007 by $180.2 million, resulting in lost profits, after interest was accounted for, of $55.64 million.  (*See* Wills Rep. at 3.)

Mr. Wills is a managing director in the consulting firm of Dispute Analytics LLC.  Id. at 1.  He is a Certified Public Accountant, a Certified Valuation Analyst, and a former partner of Pricewaterhouse Coopers with over thirty years of experience.  (Pl.'s Wills Opp. Br. at 8.)  He has spent the last thirteen years providing services to law firms, corporate counsel, government, and non-profit organizations.  *Id.*  Mr. Wills currently serves as an adjunct professor at Georgetown University where he has taught courses at the undergraduate and graduate level at the McDonough School of Business.  *Id.*  He has testified as a witness on over thirty-five occasions.  *Id.*

D.    Paul Farris

Dr. Farris was retained by Plaintiff to opine as to whether Defendants' alleged improper actions caused Plaintiff to lose value as a business concern.  (Farris Rep. at 44-49.)  Dr. Farris is the Managing Director of Dispute Analytics, a former partner of PricewaterhouseCoopers, and a member of the adjunct account faculty at the Darden School of Business at the University of Virginia.  (Pl.'s Wills Opp Br. at 1.)

He concluded that the combined result of Defendants' action, specifically the alleged unauthorized access to Plaintiff's computer information and misleading statements about

Plaintiff's compliance rates and financial stability, caused Plaintiff's base of retailed and CPG customers to significantly deteriorate in the amount of $178,000,000. *Id.* at 4.

Dr. Farris relied on Mr. Wills 2006 estimates of lost revenue and earning before interest, taxes, depreciation, and amortization ("EBITDA") as the basis for his own damage analysis. (Def.s' Wills Br. at 5.) Mr. Farris arrived at his damage estimate by multiplying Mr. Wills' estimates of lost revenue at three (3) percent and lost EBITDA for 2006 at eleven point five (11.5) percent, and choosing the midpoint of the resulting figures. (Farris Rep. at 47.) He based those multiples on the ratios of enterprise value to revenue for Catalina Marketing ("Catalina") and Insignia Systems ("Insignia") and EBITDA for only Catalina as of March 31, 2007. (Def.s' Wills Br. at 5.) Dr. Farris used those companies as benchmarks for estimating an appropriate value of a revenue earnings multiple for Plaintiff. *Id.* At his deposition, Dr. Farris stated that he selected both Catalina and Insignia because the investment banking firm CIBC use those two companies as comparables in its valuation of Plaintiff when CIBC was trying to sell Plaintiff "in or about 2001". (*See* Farris Rep. at 46-47.) Dr. Farris also stated that "[i]n their 2001 valuation, CIBC used guideline companies that operated in the in-store marketing segment or which had similar growth prospects and valued [Plaintiff] based on multiples of revenue and of earnings before [EBITDA]." *Id.* at 47.

CIBC, in its 2001 valuation, used three comparables: Catalina, Insignia, and Lamar Advertising ("Lamar"), all of which are publicly traded companies. *Id.* Dr. Farris did not include Lamar because he felt that "it was less comparable as it does not rely on any major retailers for advertising space." *Id.* Dr. Farris stated in his deposition that Catalina and Insignia were in many respects different from Plaintiff. (Farris Dep. at 288-91; 294-99; 302.) For

instance, Plaintiff's sales, which were $25,000,000 in 1999, were significantly lower than

Catalina's sales, which totaled $264,000,000 in 1999.  (Def.s' Wills Br. at 6.)  Dr. Farris does not

know whether Plaintiff and Catalina were similar in regard to debt-to-equity rations, value of

fixed assets, organizational structures, number of employees, cash flows, levels of external

funding required to fund future growth, dividend payouts, debt service obligations, or EBITDA

to relative sales.  (See Farris Dep. at 288-91; 294-303.)

     E.     <u>Edward McLaughlin</u>

     Dr. McLaughlin was retained by Plaintiff to provide background on industry standard

operations and practices and to analyze the impact of Defendants' alleged misconduct.  (Pl.'s

McLaughlin Opp. Br. at 5.)  Specifically, he opined that Defendants' conduct, if true, "would

have substantially impaired [Plaintiff's] ability to conduct business successfully and indeed could

have led to the ruination of [Plaintiff's] business."  *Id.*  Furthermore, he opined that, if the

allegations were true, "it was [his] opinion that the impact of Plaintiff's business [from false and

misleading audits] is likely to have been detrimental, or even ruinous."  *Id.*  In addition, "it was

[his] opinion that these written communications [from NAM to Retailers] would have received a

great deal of written attention among retailers and would have likely created a very negative

impression of [Plaintiff]."  *Id.* at 6.  Lastly, Dr. McLaughlin concluded that "such negative

information [about Plaintiff's insolvency] is likely to have caused considerable damage to

[Plaintiff's] reputation and thus their ability to conduct business."  *Id.*

     Dr. McLaughlin has his masters and doctorate degrees in Agricultural Economics from

the University of Vermont and Michigan State University, respectively.  Dr. McLaughlin

specializes in food marketing economics and policy analysis.  *Id.* at 3.  He has published over one

hundred peer-reviewed books, articles, research reports and other papers pertaining specifically to food retailers, wholesalers, manufacturers, and food industry marketing and decision-making. *Id.* at 3-4.  At Cornell University, he is the Robert Tobin Professor of Marketing University, the Director of the Undergraduate Business Program, the Director of the Food Industry Management Program, and the Director of the Food Executive program.  *Id.*

In reaching his conclusions, Dr. McLaughlin developed an "industry survey instrument" which he used in interviewing twenty-eight (28) individuals.  (McLaughlin Rep. at 7.)  Of these twenty-eight (28) individuals, fourteen (14) were employees of retailers, nine (9) were employees of CPGs, and the other five (5) interviewees were from entities that Dr. McLaughlin described as "adjacent companies that provide support to or are involved with in-store-like promotion material."  *Id.*; McLaughlin Dep. at 153-54.  Of these interviewees, Dr. McLaughlin identified one person who was responsible for deciding whether to contract with Plaintiff or Defendant. *See* McLaughlin Dep. at 168.  Dr. McLaughlin either knew the interviewees personally or they were recommended to him by people whom he knew personally.  *Id.* at 144-45; 147-48.

Defendants argue that Dr. McLaughlin did not use a standard questionnaire in conducting his interviews, did not record verbatim either the questions that he asked or the answers that he received, did not retain his notes from the interviews, failed to interview people from companies that were geographically representative, and used an unreasonably small sample of people from whom to interview.  (*See* Def.s' McLaughlin Br. at 3-8.)  Specifically, although Dr. McLaughlin concludes that "although a limited sample, every person interviewed . . . that had had previous personal knowledge of the dealings and performance of [Plaintiff] and [Defendants] confirmed that their opinions of the financial and operating soundness of [Plaintiff] had been negatively

influenced by information provided by [Defendants'] agents," (McLaughlin Rep. at 16), he was not able to identify a single interviewee who supported that "conclusion" or had that reaction. (Def.s' McLaughlin Br. at 6.)

Defendants contends that there is no explanation in Dr. McLaughlin's Report as to why none of the interviewees led Dr. McLaughlin to the conclusion that the interviewees' opinions were influenced by the alleged business disparagement. *Id.* Indeed, the only interviewee that Dr. McLaughlin identified who indicated that he was familiar with both of Plaintiff and Defendant was Dan Dmochowski of Safeway. *Id.* at 6-7. Mr. Dmochowski apparently did not tell Dr. McLaughlin that his opinions about Plaintiff had been negatively influenced by Defendant. *Id.* at 7. Rather, he said that "his opinion of [Plaintiff] was based on other completely different factors – namely that the owner and senior executives of [Plaintiff] were "bizarre to deal with". *Id.*; McLaughlin Dep. at 167; 257; 346-47. Moreover, Dr. McLaughlin's interview notes expressly stated that the interviewees would not likely be influenced by negative comments that one marketing services company made about another, and would not terminate a contract based on hearing such comments unless there was substantial evidence that a vendor had failed to comply with its contractual obligations. (Def.s' McLaughlin Br. at 7.)[2]

Plaintiff argues that Dr. McLaughlin's expert testimony was not a "public opinion poll"

_____

[2] *See* Exhibit 1063 at FGI 220973, 220992-93 (Ed Porter of Stop and Shop stating that "Ed would check negative info himself but this doesn't happen too much. Would question first vendor integrity"); FGI 220988 (notes from interview of Joe Sheridan of Wakefern, stating that "[v]endors rarely offer negative information about a supplier. Such practice would only look unprofessional for the vendor"); FGI 220991-92 (notes from interview of Ken Shields of Procter and Gamble, stating that "'[n]egative sell' doesn't work"); FGI 220985-85 (notes from interview with Tim LeBeau of Drug Fair, stating that "bashing is uncommon . . . plus risky strategy for basher . . ."); *and* FGI 220990 (notes from interview of Chris Linskey of ADVO, stating that "disseminating strictly negative information is very rare in most sales and marketing channels").

or "survey" that was meant to be quantified.  (Pl.'s McLaughlin Opp. Br. 8-9.)  Moreover,

Plaintiff stresses that Dr. McLaughlin's opinions are based upon his vast experience in the

industry.  *Id.* at 6.

     F.    <u>Willard Bishop</u>

Plaintiff retained Dr. Bishop in July 2007 to "provide an opinion on the May 7, 2007

report of Dr. McLaughlin and the June 28, 2007 report of Dr. Ericksen, Defendants' comparable

expert, that criticized Dr. McLaughlin's report." (Bishop Rep. at 1.)  Plaintiff named Dr. Bishop

pursuant to the Court's Order allowing Plaintiff the option of naming an additional expert to

respond to Defendants' additional expert.  (Pl.'s Bishop Opp. Br. at 2.)  Dr. Bishop reviewed Dr.

McLaughlin's report, Dr. Ericksen's report, and Dr. McLaughlin's deposition in undertaking his

analysis.  (Bishop Rep. at 3.)  Based on those three documents, Dr. Bishop opined that Dr.

McLaughlin's work reflected his specialized knowledge of the grocery industry.  *Id.* at 3-5.  He

also opined that Dr. McLaughlin properly conducted "executive interviewing," which, according

to him, is a method that "is accepted as reliable by academics, consultants, and executives in the

U.S. grocery industry" to "gather information about trade practices."  *Id.* at 3-4, 6.

Dr. Bishop asserts that "executive interviewing" differs from survey research in several

ways.  First, he asserts that "executive interviewing" does not require random selection, but

instead may be conducted with an intentionally defined population."  (Def.s' Bishop Br. at 3.)

He contends that Dr. McLaughlin's selection of interviewees accord with "principles relied upon

by most practitioners of executive interviewing in the grocery business."  (Bishop Rep. at 7.)  Dr.

Bishop also justifies Dr. McLaughlin's decision to include interviewees with whom he had prior

personal or business relationships.  (Def.s' Bishop Br. at 3.)  He states that this approach

"involves principles that are relied upon by others doing executive interviewing in the grocery

business." (Bishop Rep. at 7-8.) He opines that Dr. McLaughlin is "uniquely well-positioned" to

conduct the interviews because executives are typically "very busy" and "not motivated" to speak

with executive interviewers. *Id.* at 8. He further opines that Dr. McLaughlin's work as director

of the Food Executive Program at Cornell University "gives him the access and the ability to

personally interview an unparalleled number of individuals." *Id.* Moreover, he states that the

"mix of companies" from which Dr. McLaughlin interviewed people is "similar to that which

would be relied upon by executive interviewers doing this type of work in the grocery industry."

*Id.* Lastly, Dr. Bishop opines that there is "no evidence of bias in Dr. McLaughlin's report and/or

his deposition." *Id.* at 9.

## III.    DISCUSSION

### A.    Federal Rule of Evidence 702

Pursuant to Federal Rule of Evidence 702, "[i]f scientific, technical, or other specialized

knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a

witness qualified as an expert by knowledge, skill, experience, training, or education may testify

thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts

or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness

has applied the principles and methods reliably to the facts of the case."

In 2000, the Supreme Court provided guidance to the federal district courts applying

Federal Rule of Evidence 702. The Court stated that "district courts serve as the gatekeepers and

must determine the reliability of the proffered testimony." *Daubert v. Merrell Dow

Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (2000). The objective of the district court's

13

gatekeeping role "is to ensure the reliability and relevancy of expert testimony" and "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

In *Daubert*, the Supreme Court set forth a non-exclusive checklist for trial courts to use in assessing the reliability of scientific expert testimony.  509 U.S. 579.  These factors include (1) whether the expert's technique or theory can be or has been tested – that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community.  *Daubert*, 509 U.S. at 590-92; *see also Simmons v. Ford Motor Co.*, 132 Fed. Appx. 950, 952 (3d Cir. 2005).  At a minimum, "[a]n expert opinion is reliable when it is based on sound methodology and 'good grounds'." *Kumho*, 526 U.S. 137; *D & D Associates v. Bd. of Educ. of N. Plainfield*, 411 F. Supp. 2d 483 (D.N.J. 2006).

In *Kumho*, the Supreme Court addressed the applicability of the *Daubert* standards beyond "scientific" expert testimony.  The Court stated that in non-scientific cases, the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's expertise, and the subject of his testimony." *Kumho*, 526 U.S. at 150.  The Court further stated that "the relevant reliability concerns may focus upon personal knowledge or

14

experience." *Id.*, *see also United States v. Ford*, 481 F.3d 215, 219 (3d Cir. 2007) (the Third

Circuit reiterated that reliability may turn on the proposed expert's "personal knowledge or

experience"). For witnesses relying solely or primarily on experience, then the witness must

explain how that experience leads to the conclusion reached, why that experience is a sufficient

basis for an opinion, and how that experience is reliably applied to the facts. *Daubert v. Merrell*

*Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1319 (9th Cir. 1995). Furthermore, the court must

still determine whether there are "good grounds" for the proffered opinion. *See Poust v.*

*Huntleigh Healthcare*, 998 F. Supp. 478 (D.N.J. 1998). Moreover, an expert may be allowed to

testify about an area in which he does not have extensive training; specifically, when the expert

has experience employing the same principles at issue, he is entitled to a "liberal standard" under

Federal Rule of Evidence 702. *See Tormenia v. First Investors Realty Co., Inc.*, 251 F.3d 128

(3d Cir. 2000).

    In addition to offering reliable expert testimony, the trial court must also determine

whether the expert has adequate "specialized knowledge" such that he is qualified to testify as an

expert. The basis of "specialized knowledge" can be from "practical experience as well as

academic training and credentials." *Kane Builders, Inc. v. Southern New Jersey Building*

*Laborers Dist. Council*, 2007 WL 2416470, at *6 (D.N.J. 2007) (quoting *Waldorf v. Shuta*, 142

F.3d 601, 625 (3d Cir. 1998)). The Third Circuit has interpreted the "specialized knowledge"

requirement liberally, finding that "Rule 702's liberal policy of admissibility extends to the

substantive as well as the formal qualifications of experts." *In re Paoli R.R. Yard PCB Litig.*, 35

F.3d 717, 741 (3d Cir. 1994).

    "The permissible scope of expert testimony is quite broad, and district courts are vested

broad discretion in making admissibility determinations." *Hill v. Reederei F. Laeisz G.M.B.H. Rostock*, 435 F.3d 404, 423 (3d Cir. 2006). It is important to note that "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho*, 526 U.S. at 152. With that said, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, *2000 Amendments*. "*Daubert* did not work as a 'seachange over federal evidence law', and 'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system'." *United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1995). Put another way, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595.

The standard of review for a district court's decision to admit or exclude scientific evidence is abuse of discretion. *General Electric v. Joiner*, 522 U.S. 136, 146 (1997). A district court specifically abuses its discretion when "it excludes testimony simply because [the court] does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers the most appropriate." *Lauria v. Natl. R.R. Passenger Corp.*, 145 F.3d 593, 598-99 (3d Cir. 1998) (citing *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996) (citing *In re Paoli*, 916 F.2d 829, 856)).

B.    William Carrington

William Carrington is a qualified expert pursuant to Federal Rule of Evidence 702. His testimony rests on sound methodology and will assist the trier of fact. Defendants' arguments essentially equate to questions of weight as opposed to admissibility.

16

Defendants argue that Dr. Carrington is not an expert because (1) he admits his lack of relevant qualifications or expertise; (2) he lacks relevant work experience; (3) he has not published anything in the pertinent subject area; (4) he has very limited experience with audits and surveys; (5) and another federal court recently found him unqualified to give expert testimony on memory sciences.  (*See* Def.s' Carrington Br. at 9-12.)  Defendants also argue that Dr. Carrington's testimony will not assist the trier of fact.

Specifically, Defendants' argue that Dr. Carrington's admissions that "he is not an expert in in-store marketing" or an "industry expert" preclude him from testifying as an expert.  *Id.* at 9. Defendants point out that "prior to this project, [Dr. Carrington] was unfamiliar with a single company that conducted audits for CPG products or programs or . . .any other in-store advertisers."  *Id.*  Defendants argue that Dr. Carrington was unfamiliar with the industry standards as well as the published authorities involved with in-store marketing.  *Id.* at 10.

Defendants also argue that Dr. Carrington's admission of his lack of relevant work experience in in-store marketing should preclude him from testifying. *Id.* at 10-11.  In addition, Defendants argue that Dr. Carrington has only one publication, which was based off of his dissertation, and "has not published a single article since 2002."  *Id.* at 11.  Defendants concede that "[Dr.] Carrington has some experience with audits and surveys", but that he has not met his burden of establishing that he is an expert in the field.  *Id.*

Defendants further argue this Court must exclude Dr. Carrington's testimony because the Eastern District Court of Virginia recently excluded Dr. Carrington as an expert in "memory sciences" by relying on "unidentified 'academic literature.'" *Id.* at 12.  The court held that "[w]hile a qualified expert in the field of economics and statistics, nothing in Dr. Carrington's

17

credentials indicates knowledge, skill, experience, training, or education in the field of memory sciences." *See Sharer v. Tandberg*, 2007 WL 983849 (E.D. Va. March 27, 2007).

Lastly, Defendants argue that Dr. Carrington's testimony will not assist the trier of fact. Defendants state that "[n]o expertise is required to compare the guidelines that [Defendants] applied in its 2002 audit of [Plaintiff] with the guidelines [Defendants] drafted in 2003 and list the differences." (Def.s' Carrington Br. at 13.)

Plaintiff argues that Dr. Carrington is qualified to testify about standard audit methodology. Plaintiff further argues that Defendants frame Dr. Carrington's expertise as an in-store marketing expert too narrowly. Specifically, Plaintiff argues that "[Defendants'] emphasis on [Dr.] Carrington's lack of in-store marketing experience is a red herring and an attempt to misguide the Court about the nature and scope of Dr. Carrington's testimony." (Pl.'s Carrington Opp. Br. at 7.) Plaintiff argues that "Dr. Carrington's opinion is being offered for his expertise in the applicable generally accepted audit methodology, and the application of those principles to [Defendants'] own guidelines and its audit of [Plaintiff's] installation." *Id.*

The Court finds that Dr. Carrington is an expert under Rule 702. As previously noted, the Third Circuit has repeatedly professed the use of a liberal standard of qualifying experts. *See Tormenia*, 252 F.3d at 128; *Elcock v. K-Mart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000). It is well settled that an expert cannot be excluded because the trial court does not deem the proposed expert to be the most qualified or because the proposed expert does not have the specialization the Court considers to be the most appropriate. *See Holbrook*, 80 F.3d at 782. Rather, if the expert meets the liberal minimum qualifications then the level of the expert's expertise goes to credibility and weight, not admissibility." *Kannankeril v. Terminix Int'l Inc.*, 128 F.3d 802, 809

(3d Cir. 1997).

Here, Dr. Carrington is an expert in audit methodology.  More specifically, Dr.
Carrington's academic training and experience qualify him as an expert in the specific area of
labor economics and econometrics; however, because of that, he is well versed in the more
general subject of audit and survey methodology.  Thus, Defendants' arguments that Dr.
Carrington admissions that he was not an expert and that he did not have the relevant work
experience are unpersuasive.  Dr. Carrington is not being offered as an in-store marketing expert.
He is, however, being offered as an expert in audit methodology.  Numerous cases within our
circuit have held that an expert opining on a general matter is not required to have experience
that is narrowly tailored to the specific industry in question.  *See, e.g.*, *Kannankeril*, 128 F. 3d at
809 ("we reject Terminix's suggestion that Dr. Gerson must be a specialist in Dursban to provide
expert testimony on the causation of [Plaintiff's] injury); *Holbrook*, 80 F.3d at 782 (the appellate
court stating that "the [trial] court's mistaken approach restricted Dr. Carpenter's testimony
based on a requirement that the witness practice a particular specialty to testify concerning
certain matters"); *Hammond v. Int'l Harvester Co.*, 691 F.2d 646 (3d Cir. 1982) (holding that
engineer whose only qualifications were sales experience in the field of automotive and
agricultural equipment and teaching high school automobile repair was nevertheless permitted to
testify in a products liability action involving tractors); *Smolow v. Hafer*, 513 F. Supp. 2d 418,
425-28 (E.D. Pa. June 25, 2007) (the court rejected the argument that expert's "general business
and accounting background" were insufficient because he lacked experience or training
specifically in the area of government accounting); *and Main Street Mortgage, Inc. v. Main
Street Bancorp., Inc.*, 158 F. Supp. 2d 510 (E.D. Pa. 2001).

Moreover, the fact that Dr. Carrington was not qualified as an expert in "memory sciences" has no bearing whatsoever on whether he is qualified to be an expert on audit methodology.  In fact, if anything, the *Sharer* court guided our analysis by concluding that Dr. Carrington was an expert in economics and statistical analysis.  Indeed, Plaintiff is offering Dr. Carrington's opinion precisely because of his expertise in that area.

Furthermore, the Court disagrees with Defendants' argument that Dr. Carrington's testimony merely rehashes the evidence.  (*See* Def.s' Carrington Reply Br. at 9-10.)  Rather, Dr. Carrington's testimony will assist the trier of fact because it is relevant and will aid the jurors' understanding on whether Defendants' president's letter to all major CPGs contained unreliable and deceptive information.  Dr. Carrington's opinion will help the jury understand why the 49% compliance rate that Defendants' reported is unreliable and misleading.  His opinion will link each of the methodological flaws in Defendants' audit to the consequences on the generated compliance ratio.  Despite Defendants' arguments to the contrary, this testimony is not easily comprehendible.  Thus, Dr. Carrington's testimony will aid the jury in their quest for justice.

Because Dr. Carrington is an expert in audit methodology and his testimony will assist the trier of fact, Defendants' Motion to preclude his trial testimony is denied.

C.    Luke Cats

Luke Cats is an expert pursuant to Federal Rule of Evidence 702.  His testimony rests on sound methodology and will assist the trier of fact.  Defendants' arguments, again, are questions of weight, not admissibility.

Defendants argue that Mr. Cats' testimony is unreliable because it is based on unreliable facts and data.  As stated by the Third Circuit Court of Appeals, an expert's opinion is reliable if

it is based on the methods and procedures of science rather than on subjective belief or unsupported speculation.  *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 742 (internal citations omitted).  Defendants rely on a case that held "where an expert fails to verify the accuracy of data upon which the expert creates a statistical analysis or renders an opinion, the resultant analysis and opinion are inherently unscientific requiring exclusion . . . under *Daubert*."  *Dreyer v. Ryder Automotive Carrier Group, Inc.*, 367 F. Supp. 2d 413 (W.D.N.Y. 2005).  Defendants further state that an "analysis is only as good as the data upon which it rest[s]" and "it is important to verify the accuracy of the data collection."  *Rowe Entertainment, Inc. v. William Morris Agency, Inc.*, 2003 WL 22124991, at *4 (S.D.N.Y. Sept. 15, 2003).

Here, Defendants argue that Mr. Cats analysis was flawed from the outset because he failed to ensure or confirm the accuracy of the data on which he relied in forming his opinions. (Def.s' Cats Br. at 10.)  They argue that Mr. Cats emphasized the manner in which he handled the evidence *after* he received it.  *Id.* (emphasis in original).  Defendants argue that "[n]either [Mr.] Cats nor [Plaintiff] can explain how the data was first saved to Plaintiff's network, or, later, to the CD that [Plaintiff] provided to [Mr.] Cats."  *Id.*  Defendants insinuate that because Mr. Povoski could not recall exactly when he burned the CD that he gave Mr. Cats and that he did not recall copying it himself, in conjunction with Mr. Cats not even inquiring as to whether the CD was reliable, then the CD – and Mr. Cats' testimony – are unreliable.  The Court disagrees.

While Defendants' arguments focus on the possibility that the underlying facts on which Mr. Cats basis his opinion have not been authenticated, it fails to take in to account that the facts are indeed reliable.  Whether Mr. Cats should have more diligently researched the underlying facts given to him by Plaintiff, in the Court's view, is a question of weight, not admissibility.  *See*

*Kannakeril*, 128 F.3d at 809.  Indeed, an "expert opinion is reliable if it is based on good grounds or methods and procedures of science rather than on subjective belief or *unsupported speculation.*"  *Daubert*, 509 U.S. at 590 (emphasis added).

Here, Mr. Cats' expert opinion is based on good grounds that could hardly be considered unsupported speculation.  Mr. Cats' testimony involves the analysis of the web server logs and the meaning of the technical data logs. (Pl.'s Cats Opp. Br. at 13.)  Mr. Cats reviewed the deposition transcript of Mr. Povoski, who testified from personal knowledge that Plaintiff's web server automatically generated logs of the accesses to the Old Site and that those logs remained on the server "untouched".  *Id.*  Moreover, Mr. Povoski excerpted those logs in April 2004 and saved the results in a file called "illegal-access.txt".  *Id.*  In addition, Mr. Povoski compressed those "untouched" log files in September 2004 and saved them to a separate location on Plaintiff's computers.  *Id.*  Although Mr. Cats later ran a forensic comparison between the compressed log files on the CD he was provided and the compressed log files that Mr. Povoski has saved in September 2004 on Plaintiff's system, the results illustrated one thing: both files were identical.  Despite Defendants argument that it cannot determine if Mr. Povoski's April 2004 excerpt and September 2004 compressed files are the same, the Court finds that Mr. Povoski's repeated sworn testimony that the web logs remained "untouched" in addition to the files being identical are enough to establish the reliability of Mr. Cats' testimony.  Moreover, Mr. Brill, Defendants' own expert, testified that he was not aware of any evidence to the contrary or that the files were unaltered.  *Id.* at 14.  In fact, Mr. Brill stated that he has no reason to question Mr. Cats or his colleagues forensic comparison of the files on Plaintiff's server as compared to the files on the CD produced in discovery.  *Id.*  Perhaps more telling, Defendant has not

identified any facts that the web server logs were intentionally or inadvertently manipulated or not properly saved despite several years of discovery. *Id.* Although it is not Defendants' burden to prove that the files were not tampered with, the Court believes that given the evidence presented, Plaintiff has met its burden of proof establishing the Mr. Cats' testimony is reliable. As previously noted, the standard for reliability is "not that high." *See In re TMI Litig.*, 193 F.3d at 697 (3d Cir. 1999).

Indeed, even if Mr. Povoski had not testified, the Court nonetheless finds Mr. Cats' testimony reliable. "The fact that it is possible to alter data contained in a computer is plainly insufficient to establish untrustworthiness." *United States v. Bonallo*, 858 F.2d 1427, 1436 (9th Cir. 1988). Here, Defendants are attempting to discredit Mr. Cats based on the possibility that the underlying data could be altered. Since there is not a shred of evidence to indicate the files were in any way manipulated, the Court finds that the documents are reliable; therefore, Mr. Cats' testimony is clearly not "unsupported speculation." *See Daubert*, 509 U.S. at 590.

The Court also finds that Mr. Cats' testimony will assist the trier of fact. There can be no question that a jury would need assistance understanding the computer files, how an Apache server generates them, what they record, and what the information contained within them actually means. (*See* Pl.'s Cats Opp. Br. at 15.) Defendants also challenge Mr. Cats' testimony by asserting that he speculates that Defendants *could* have downloaded and saved files in a short period of time, and subsequently printed or e-mailed the files to others while offline. (*See* Def.s' Cats Br. at 14) (emphasis in original). However, Defendants' own expert, Mr. Brill, testified that someone could have downloaded and saved the files, could have printed the files, and could have e-mailed them. (*See* Pl.'s Cats Opp. Br. at 15.)

Moreover, Defendants argue that Mr. Cats did not conduct any independent research that the alleged access was "unauthorized" (Def.s' Cats Br. at 6.)  On the contrary, however, the Court finds that Mr. Cats did not need to undertake any independent research because (1) Defendants admitted that Plaintiff did not grant Defendants' permission for access to any Plaintiff website, (Def.s' Resp. to Req. for Admis. No. 2, 10), and (2) Mr. Povoski testified that he would have known if Plaintiff had granted Defendants access to the Old Site. (Povoski Dep. at 192:10-193:3.)  Based on the foregoing, Mr. Cats need not reach an independent conclusion on whether Defendants' actions were unauthorized.

Lastly, Defendants argue that Mr. Cats' testimony is not helpful to the trier of fact because he "incorrectly concluded that the website must have been password-protected." (*See* Def.s' Cats Br. at 1.)  However, Mr. Cats correctly opined that the Old Site was password protected. (Pl.'s Cats Opp. Br. at 16.)[3]

Defendants' arguments that Mr. Cats' testimony will not help the trier of fact because he relies upon "unreliable facts" are unpersuasive.  As noted above, the Court finds that the underlying facts are reliable.  (*See* Def.s' Cats Reply Br. at 11.)

In their reply brief, Defendants point out that Mr. Cats filed an "impermissible and entirely new expert report that is hidden under the guise of a 'Supplemental Affidavit'". (Def.s' Cats Reply Br. at 1.)  The Court decided that Mr. Cats' Supplemental Affidavit was permissible and was not a "entirely new expert report."  At oral argument, the Court stated that it did not

---

[3] Plaintiff's website could be accessed by a "common username and password shared by retailers" and during Cycle 9 and 10 of 202 Plaintiff distributed the relevant username and password that defendant used to access this site.  (Pl. Ans. to Interrog. No. 14.)

consider the second report to be a supplemental report. (*See* Transcript dated November 16, 2007, at 17.)  With that said, the Court granted Defendants' motion to re-depose Mr. Cats as well as have Defendants' own expert prepare a supplemental report to respond to Mr. Cats' original report.  *Id.* at 18.

Because Mr. Cats' testimony is based on good grounds and will assist the fact finder, his expert testimony is permitted and Defendants' motion to preclude his testimony is denied.

D.      John Wills

John Wills is an expert pursuant to Federal Rule of Evidence 702.  His testimony rests on sound methodology and will assist the trier of fact.  Defendants' arguments, once more, are questions of weight, not admissibility.

Defendants argue that Mr. Wills testimony is unreliable and fails to fit the facts of the case.  (*See* Def.s' Wills Br. at 8, 17.)  They argue that Mr. Wills testimony, specifically his use of the "before and after" methodology, was fatally flawed because it omitted "a fundamental step that courts across the country, and leading treatises, have recognized as critical to any proper assessment of damages."  *Id.* at 9.  "Where a plaintiff complains of a wide range of alleged misconduct and a defendant insists that some of its conduct was lawful and that plaintiff's losses were caused by other parties or events, the law requires plaintiff's experts to calculate for the jury an estimate of the damages that resulted from the wrongful conduct and to prove . . . those damages; . . . [d]eviation from that cardinal rule results in speculative awards that cannot be sustained."  *See* the Federal Judicial Center's REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (explaining that "[i]f a damages analysis includes the effects not caused by the defendant, it is a defective analysis").

25

Defendants argue that Mr. Wills deviated from the cardinal rule because he failed to take into account other factors that could have affected the Plaintiff's level of revenues.  (Def.s' Wills Br. at 9; Def.s' Wills Rep. Br. at 10.)  Defendants argue that Mr. Wills made only two minor adjustments – to account for a decrease in the number of K-Mart stores and a decline in Plaintiff's revenues per store – both in the "after" period of his analysis.  (Def.s' Wills Br. at 9-10.)  Defendants illustrate that at least some significant portion of the decline in Plaintiff's revenues and profits resulted from actions and events that were completely unrelated to Defendants' alleged conduct.  (Def.s' Wills Br. at 11.)  Mr. Wills nonetheless clung to his opinions that (1) all of Plaintiff's lost revenues and profits were caused by Defendants' alleged misconduct, (2) no adjustments to its total damage estimate would be necessary even if Plaintiff did not prevail on one or more of its liability claims, and (3) any liability on Defendants' part for any of the alleged misconduct should result in an award of the total amount of damages that he estimated.  *Id.* at 11-12; *see also* Wills Dep. at 50, 198-99, 141-43.

Defendants argue that the Third Circuit has consistently excluded expert testimony regarding profits or other measures of damages where the testimony rests on fundamentally flawed assumptions that do not reflect real world conditions.  *Elcock v. K-Mart Corp.*, 233 F.3d at 755.  Defendants assert that Mr. Wills refusal to examine or factor into his analysis undisputed testimony of retailers or CPG representatives or the undisputed evidence regarding Plaintiff's own board of directors meetings is evidence of his failure to consider real world conditions.  Therefore, Defendants argue that his methodology is flawed and insufficient.

Defendants point to *In re Aluminum Phosphide Antitrust Litig.*, 893 F. Supp. 1497, 1502-05 (D. Kan. 1995), a case that involved the "before and after model".  There, the court rejected

proposed expert testimony observing that "[o]ne of the basic principles of economics, as applied

to the 'before and after' model, is that changes in supply, demand, and competition affect prices,

and one cannot properly assume the *sole cause* of any price difference between the conspiracy

period and the normative period is the conspiracy itself." *Id.* at 1504 (emphasis added).

Defendants further argue that Mr. Wills testimony suffers from the same fatal flaw: his failure to

account for other changes in the market and other undisputed evidence renders his opinions

invalid.  The Court disagrees.

      As Judge Posner stated, "people who want damages have to prove them, using

methodologies that need not be intellectually sophisticated but must not insult the intelligence."

*Schiller and Schmidt, Inc. v. Nordisco, Corp.*, 969 F.2d 410, 415 (7th Cir. 1992).  Mr. Wills has

proven damages and, more importantly, has satisfied the criteria of Federal Rule of Evidence

702.

      At the outset, it must be noted that the "before and after" method is recognized by experts

in the field as an acceptable method to calculate lost profits.  *See, e.g.*, Pratt, Shannon P., Robert

F. Reilly and Robert P. Schweihs, *Valuing* a *Business*, Fourth Edition, 2000 at 829; American

Institute of Certified Public Accountants, Business Valuation and Forensic & Litigation Services

Section, Practice Aid 06-4 "*Calculating Lost Profits*" at 25; Litigation Services Handbook: The

Role of the Financial Expert at 38.  Furthermore, the *Reference Manual on Scientific Evidence*,

upon which Defendants rely, describes a damages study that projects earnings into the future at

the rate of growth of the previous three years.  (Pl.'s Wills Opp. Br. at 10-11.)  It also references

that defendants in such a case may dispute this with their own study that projects that earnings

would have declined even without a breach.  *Id.*  Most importantly, though, the *Manual* itself

states that the difference between the two studies "*is a factual dispute*".  *See Manual* at 25 (emphasis added).  The *Manual*, like *Daubert*, does not call for exclusion but rather an adjustment if there is reliance on a standard methodology that omits a relevant factor.  (Pl.'s Wills Opp. Br. at 11.)  Therefore, the dispute is a question of fact for the jury to decide.

Plaintiff points out that the thrust of Defendants' argument is that Mr. Wills "fail[s] to distinguish between lawful and unlawful conduct in their damage estimates." *Id.* at 12.  Such argument, according to Plaintiff, misstates the law with respect to damages as well as the damages analysis conducted by Mr. Wills.  First, Plaintiff asserts that to the extent Mr. Wills did not take other real world factors in to consideration, Defendants must nonetheless demonstrate that those factors mattered.  *Id.*  When challenging the admissibility of Plaintiff's expert testimony, a party must move beyond empty criticisms and demonstrate that a proposed alternative approach would yield different results.  *Bazemore v. Friday*, 478 U.S. 385, 403 n. 14 (1986); *see also Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395, 1416 (D.C. Cir. 1988) ("mere conjecture or general assertions of inadequacies in the opponent's statistical case, without demonstrating their effect on the results, will not suffice").  The Court finds that Defendant, despite illustrating that Mr. Wills did not take in to account certain factors, has made no showing to quantify how those factors, such as "legal competition", mattered.

Moreover, the Court finds that damages may be awarded where illegal and legal conduct are intertwined.  In *Spray-Rite v. Monsanto*, the court stated that "[w]e will not deprive [Petitioner] of this recovery merely because the jury may have found that Monsanto combined lawful conduct with unlawful conduct making it impossible to determine which portion of the total damages was caused by the unlawful conduct."  684 F.2d 1226, 1242-43 (7th Cir. 1982).

Similarly, Mr. Wills did not calculate the amount of damages attributable to lawful conduct versus unlawful conduct.  However, it is likely impossible to separate lawful conduct from unlawful conduct and come up with a precise amount.  Thus, the issue is one of weight, not admissibility.  Similar to the holding in *Spray-Rite*, this Court will not deprive Plaintiff the opportunity to present damages through Mr. Wills' report.

The Court also finds that Mr. Wills did take other material factors in to consideration when issuing his report.  Thus, the Report's methodology is permissible.  Specifically, Mr. Wills factored in the unit price of floor and shelf ads, which are prices charged by Plaintiff.  (Pl.'s Wills Opp. Br. at 15.)  This is not, as Defendants characterize it, a "minor factor", but rather a fundamental one.  In addition, Mr. Wills factored the decline in K-Mart stores as a result of its bankruptcy filing.  (*See* Wills Rep. at 12.)  Mr. Wills concluded that lawful competition could not explain the abrupt drop off in Plaintiff's revenues beginning in 2003 after numerous years of consistent growth.  (Wills Dep. at 78-79.)

Moreover, Mr. Wills accounted for other factors by making assumptions that accounted for such competition and tended to suppress his estimate of damages.  Plaintiff argues that the effect of these assumptions would have been tantamount to Mr. Wills factoring in lawful competition in the first place.  For example, Mr. Wills assumed flat economic growth during the damages period relative to the benchmark year of 2002.  (Pl.'s Wills Opp. Br. at 16.)  In fact, Mr. Wills did not assume that growth would occur even at the rate of inflation, the result of which would equate to a restrained damage estimate as opposed to an inflated one.  *See id.*  He also limited his before and after model to Plaintiff's customers in the baseline year of 2002. Therefore, he assumed that Plaintiff would have won no new customers, the result of which

29

would underestimate damages.  *See id. at 17.*  Furthermore, Mr. Wills offset damages caused to Plaintiff by the CPGs who did reduce their purchases with revenues from other CPGs who increased purchases from Plaintiff.  *Id.*  In addition, Mr. Wills used the actual revenues of Plaintiff in the benchmark year of 2002 to determine if there were damages in 2003 and thereafter; thus, lawful or unlawful competition by Defendants in 2002 and before suppressed Plaintiff's revenues in 2002 and limited the damages estimated by Mr. Wills from 2003 to 2007.  This limits Mr. Wills damages calculation because the Complaint stated that Defendants were engaged in unlawful competition from *2002 and before.  Id.* (emphasis added).

At most, assuming all of Defendants' objections are material and valid, Mr. Wills testimony can be critiqued by another expert, not stricken.  If, for example, there was a slowing of the economy is any quarter, then Defendants' expert can measure it and adjust the damages downward.  Likewise, if there are specific CPGs who are required to be excluded from the damages estimate, Defendants' expert can exclude them and adjust the damages downward.  If a store reduction of four hundred stores were required to be accounted for, as Defendants assert, Defendants' expert could make that calculation.  (*See* Pl.'s Wills Opp. Br. at 23-24.)  This point is especially telling since Defendants, in their own brief, quote Dr. Farris stating that "Wills' damages calculations would have to be adjusted if any of [his] key assumptions are wrong" (*See* Def.s' Wills Br. at 12.)  Similarly, Defendant quotes the *Manual* to the same effect.  *Id.* at 9.

The cases cited by Defendants, chiefly *Elcock* and *Mercedes-Benz U.S.A. LLC v. Coast Automotive Group, Ltd.*, 2006 WL 2830962 (D.N.J. Sept. 29, 2006) are both distinguishable from this case.  In *Elcock*, the Court excluded damages testimony of a vocational rehabilitation expert with "thin" qualifications.  *See Elcock*, 233 F.3d at 755.  Here, Mr. Wills clearly does not

have "thin" qualifications.  On the contrary, Mr. Wills qualifications should  not even be at issue.

Similarly, in *Mercedes-Benz*, an expert estimated damages based on the average growth of retail sales in the New York area as opposed to actual sales.  *See Mercedes-Benz*, 2006 WL 2830962, at * 12.  The expert report contained "no analysis and consisted entirely of profit schedules based on factual assumptions that the report does not explain or analyze in any significant way."  *Id.*  Here, however, Mr. Wills analysis is based upon the actual change in Plaintiff's sales.  Further, Mr. Wills explains and analyzed his methodology which was based on facts as opposed to assumptions.

In sum, Mr. Wills relied upon a sound methodology: the "before and after" approach.  His calculations, to the extent that some of his key assumptions are wrong, may be adjusted.  However, making adjustments is not analogous to unreliable.  Although Mr. Wills may be taken to task during cross-examination, his expert testimony meets the requirements of Rule 702 and Daubert.[4]

In the end, the Court finds that Mr. Wills' testimony will assist the trier of fact and fit the facts of the case.  In order to "be fit", expert testimony "must have a traceable and analytical basis in objective fact."  *Bragdon v. Abbott*, 524 U.S. 624, 653 (1998).  Mr. Wills' testimony is based upon the actual sales of Plaintiff.   Without his testimony, the jury will have a difficult time in measuring Plaintiff's damages.  Since this is a complex matter that requires a detailed economic analysis, Mr. Wills' testimony will be helpful.  Under Rule 702, it is not the Court's province to determine who is the best expert or the most qualified.  Defendants will have the

---

[4] It is more appropriate for Defendant to cross-examine Mr. Wills with regard to why he selected the dates from which he measures damages, as this is a factual dispute.  (*See* Def.s' Wills Reply Br. at 1-2.)

opportunity to vigorously cross-exam Mr. Wills in addition to presenting their own expert

witness at trial.[5]   Therefore, Defendants' motion to preclude Mr. Wills' testimony is denied.

     E.    <u>Paul Farris</u>

     Paul Farris is an expert pursuant to Rule 702.   His testimony rests on sound methodology

and will assist the trier of fact.   Defendants' arguments are questions of weight, not admissibility.

     Defendants argue that Dr. Farris' expert testimony should be precluded because (1) since

his work relies on Mr. Wills' work and Mr. Wills' work is unreliable then Dr. Farris' work is

similarly unreliable; (2) Dr. Farris' testimony is unreliable regardless of Mr. Wills' testimony;

and (3) Dr. Farris' work does not fit the facts of the case or assist the trier of fact.

     First, Defendants argue that since Dr. Farris' opinions are based upon Mr. Wills' work

that those opinions are unreliable and inadmissible.   (Def.s' Wills Br. at 21.)   Defendants

correctly argue that if "Wills' calculations require revision, Farris' calculations must also be

revised."   *Id.*   Of course, even if the calculations need to be revised, the underlying reports are

still admissible.   The *Manual*, as previously noted, instructs an adjustment of the calculations,

not an exclusion of evidence.   (*See, e.g.*, *Manual* at 25 (the difference between the two studies "*is

a factual dispute*")).

     Defendants further assert that Dr. Farris' testimony must be precluded because "[i]t is an

abuse of discretion to admit expert testimony which is based on assumptions lacking any factual

---

[5] Defendants argue that Mr. Wills' "stubborn insistence" that all of the losses were caused solely by Defendants' alleged conduct and his refusal to consider other factors makes his analysis unreliable.   The Court, noting that while Mr. Wills' testimony is not perfect, it admissible since, at most, his testimony would need to be adjusted as opposed to excluded, and he, in fact, did consider other factors in his analysis (as previously discussed above).   (*See* Def.s' Wills Br. at 17-21.)

foundation in the record." *Elcock*, 233 F.3d at 756 n. 13.  The Court disagrees with Defendants' position because Mr. Wills' calculations are promulgated from the facts of the case; specifically, the actual financial losses that Plaintiff suffered that was attributable to Defendants' alleged illegal conduct.  Therefore, it would be an abuse of discretion to preclude Dr. Farris' testimony simply because Mr. Wills' testimony needs to be adjusted.  As previously noted, Mr. Wills' testimony is admissible pursuant to Rule 702.  Thus, given the Court's decision with respect to Mr. Wills, it would be illogical to exclude Dr. Farris' testimony.  As such, the Court rejects Defendants' argument.

Defendants further argue that Dr. Farris' testimony is unreliable because he "assumed that all of [Plaintiff's] lost revenues and profits resulted from [Defendants'] alleged wrongful conduct" and blindly accepted Mr. Wills' calculations without (1) understanding them or (2) conducting any independent analysis or investigation of his own.  (Def.s' Wills Br. at 22-23.) Further, Defendants argue that Dr. Farris has not shown an "adequate link between the alleged misconduct and the damages claimed."  *See Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 60 (2d Cir. 2002).  Defendants argue that Plaintiff has failed to provide evidence that any CPGs or retailers were influenced by the alleged disparagement.  (Def.s' Wills Br. at 23.)

Defendants also contend that Dr. Farris's report suffers from two methodological flaws: (1) Dr. Farris failed to use an adequate quantity or quality of comparable companies and (2) he failed to discount the claimed damages in a matter that reflects the lack of marketability of a closely held corporation like [Plaintiff].  *Id.* at 24.

First, Defendant argues that Dr. Farris did not conduct a proper benchmark analysis.

33

Defendants cite a leading treatise which "stresses the importance of an 'exhaustive search' for similar companies and sets forth a list of factors 'to consider in determining comparability.'" *Id.* (citing Shannon P. Pratt, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* 214-15, 220 (2d ed. 1989)).  Those factors include (1) capital structure, (2) credit status, (3) depth of management, (4) personnel experience, (5) nature of competition, and (6) maturity of the business.  *Id.* at 220.  Pratt's work also states that "in many valuation situations, the subject company is so unique that it is difficult to find a set of good guideline companies." *Id.* at 231.  "In these cases, the analyst may find a group of companies that can shed some light on the valuation questions but may consider one or a few more directly comparable to the subject company than the rest."  *Id.*  (emphasis added).

Defendants argue that since Dr. Farris gave greater weight to Insignia and Catalina, his testimony is unreliable.  (Def.s' Wills Br. at 25.)  However, Dr. Farris permissibly gave greater weight to two of the companies and no weight to Lamar, which he believed to be less similar than Plaintiff.  (*See* Pl.'s Wills Opp. Br. at 25.)  As Pratt's work indicates, Dr. Farris was permitted to consider some companies more directly than others.

Defendants further criticize Dr. Farris' report because he dropped Lamar as one of his three guideline companies.  *Id.* at 25.  However, "[i]t is not necessary to use every guideline company selected for every measure utilized."  *Valuing a Business* at 237.  In fact, "[t]he analyst should use caution and careful judgment . . . to be sure that the use of certain guideline companies for the calculation of some pricing multiples and not others do not introduce bias or distortion to the pricing multiple implications."  *Id.*  Dr. Farris, by excluding Lamar in its entirety, did precisely what Pratt instructs him to do: use caution and careful judgment.  Dr.

Farris excluded Lamar because they had higher multiples of revenues and earnings that Insignia and Catalina.  (Pl.'s Wills Opp. Br. at 26.)  If Dr. Farris included Lamar, his damages would increase.  *Id.*  Although Defendant does not agree with Dr. Farris' decision, they will have ample opportunity to cross-examine him at trial.  However, his report is based on sound methodology.  Defendants' arguments focus on weight, not admissibility.

Defendant further argues that Dr. Farris used guideline companies that lack similarity to Plaintiff.  *Id.*  Pursuant to the market approach, it is appropriate to use companies that are similar, but they do not need to be similar in all respects.  *Id.*[6]  Here, Dr. Farris, using his judgment, valued two publicly traded companies to Plaintiff, a closely held corporation.  As Dr. Farris himself admits, there are differences between Plaintiff, Insignia, and Catalina.  (Farris Dep. at 287-91; 294-99; 302.)  As such, the Court notes that Defendants will no doubt effectively illustrate the differences between Plaintiff, Insignia, and Catalina while cross-examining Dr. Farris.  However, pursuant to Rule 702, its progeny, and *Valuing a Business,* Dr. Farris' testimony is based upon sound methodology.  *Id.*

Defendants also argue that Dr. Farris relied on guideline companies selected by the investment bank CIBC and that since Dr. Farris knows nothing about the accuracy or validity of CIBC's study, his reliance on their study is improper and speculative.  (*See* Def.s' Wills Br. at

---

[6] *See Valuing a Business* at 230 ("[o]ne succinct quote summarizes the essence of the key characteristic that should be present in a guidelines company: 'Do the underlying economics driving this comparable company math those that drive our company?'  Of course, this quote does not suggest that the economics of the guideline companies be a perfect match to the economics of the subject company.  Although this relationship is ideal, analysts rarely encounter it in the real world.  Rather, this quote indicates that the microeconomic factors that drive the guideline companies should be sufficiently similar to the microeconomic factors that drive the subject company").

25.)  However, Defendants ignore that Dr. Farris used CIBC's selection as a starting point and then made his own determination of comparability of the guideline companies to Plaintiff.  (*See* Farris Rep. at 47 *and* Farris Dep. at 295: 6-15.)  Pursuant to *Valuing a Business*, it is appropriate for appraisers to rely on the work of other experts or sources.  *Valuing a Business* at 237 ("[t]his chapter presents the most comprehensive general sources available regarding guidelines public companies.  If not satisfied with the list developed through these sources, the analyst can consult trade association membership lists and regional investment publications or ask the management of the subject company and of companies discovered through the conventional search for additional prospects").  Here, Dr. Farris used CIBC's study as a starting point and then made his own determinations.  For instance, Dr. Farris concluded that the CIBC valuation analysis, valuing Plaintiff between $221 and $495 million, was too high.  (Farris Rep. at 45.)  Accordingly, the Court disagrees with Defendants' argument.

In addition to arguing that Dr. Farris failed to account for an adequate quantity or quality of comparable companies, Defendants also argue that he disregarded a lack of marketability.  (*See* Def.s' Wills Br. at 27.)  Specifically, Defendants argue that "an interest in a business is worth more if it is readily marketable or, conversely, worth less if it is not."  *Id.* at 27 (citing *Valuing a Business* at 239).  To reflect this, experts routinely employ a "discount for lack of marketability" in their analyses of the value of a closely held corporation like [Plaintiff]."  *Id.* Defendants argue that "there is no dispute that (1) a methodologically proper estimate of the value of a closely held company must include some discount to reflect the lack or marketability and (2) Dr. Farris' analysis did not include any such discount."  *Id.*  The Court disagrees.

Dr. Farris computed damages by calculating a differential in value for Plaintiff assuming

36

an actual valuation and a valuation but-for the conduct of Defendants and then compared the two. (*See* Pl.'s Wills Opp. Br. at 27.)  Also, Pratt states that when valuing a controlling interest, which is the exact situation the Court is presented with here, "[a] discount for lack of marketability may or may not be appropriate." Pratt, Shannon P. *The Market Approach to Valuing Businesses*, Second Edition, 2005, 33.  Defendants arguments rest upon propositions that relate to stand-alone valuation of minority interests as opposed to valuing controlling interests.  (Pl.'s Wills Opp. Br. at 27.)[7]  In addition, Pratt also states that "it is often useful to use the guideline publicly traded company method even when valuing controlling interests." Pratt, *Valuing a Business,* 229. This is exactly what Dr. Farris did.

In addition to having a reliable methodology, the Court finds that Dr. Farris' testimony will be helpful to the trier of fact.  Without the computation of damages presented by Dr. Farris, the jury will have a perplexing time measuring damages suffered by Plaintiff.  A lay jury will not comprehend the detailed nuances and intricacies involved in calculating Plaintiff's lost profits. Indeed, "data standing alone [is] meaningless to a lay person."  *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1238 (3d Cir. 1993).

The Court acts as a gatekeeper pursuant to Rule 702, but that role does not entail

---

[7] In fact, applying discounts for lack of marketability to controlling interests is arguably a controversial concept in the field of valuation.  *Compare* Pratt, Shannon P. *Business Valuation Discounts and Premiums*, 2001, p. 167 ("The whole concept of DLOM [Discount for Lack of Marketability] for controlling interests is still controversial in the minds of some.  There are those who that there should never be a discount for a lack of marketability for controlling interests.  Others have espoused the notion that whether a DLOM is appropriate for a controlling interest depends on how the control value was derived.  The lack of an empirical database to serve as a benchmark exacerbates the problem.") *with* Pratt, *Valuing a Business*, 26 ("the degree of marketability or lack of it has a much greater impact on value than most people realize.  It is not uncommon for discounts to run as high as 50 percent and, in many instances, higher!")

precluding expert testimony that the Court feels is not the "best".  Rather, the Court focuses on whether an expert has met Rule 702 and the factors set forth in *Daubert*.  Here, Dr. Farris relies upon a sound methodology and his testimony will assist the trier of fact.  Accordingly, Defendants' motion to preclude Dr. Farris' testimony is denied.

  F. <u>Edward McLaughlin</u>

  The testimony of Edward McLaughlin fails to meet the requirements of Federal Rule of Evidence 702 because Dr. McLaughlin, although intermittently qualified in the field of store marketing, failed to use an acceptable methodology to establish causation in this business torts case.  Furthermore, even if he used an acceptable methodology, his testimony would be inadmissible because his conclusions from his "executive interviews" are in direct contrast with the statements made by the interviewees and, accordingly, his conclusions do not "fit" the issues in this case.

  The critical question in establishing causation in a business torts case is whether plaintiff can identify specific admissible evidence in support of its contentions that wrongful conduct by the defendant caused plaintiff to lose specific business that it previously had or that it sought and had a reasonable expectation of obtaining.  *See, e.g.*, *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 563 A.2d 31, 37 (N.J. 1989).

  In order to formulate his opinions, Dr. McLaughlin reviewed the academic and trade literature and developed what he referred to as an "industry survey instrument" that he used to conduct survey interviews of twenty-eight individuals."  (McLaughlin Rep. at 7.)  However, Dr. McLaughlin, while opining about the *likely* opinions of retailers and supplier reactions to various practices allegedly initiated by Defendants, failed to show any *specific or actual* fact of a CPG or

a retailer who can offer admissible testimony that the witness' company stopped doing business with Plaintiff or reduced the volume of its business with Plaintiff because of Defendants' conduct.

The only person Dr. McLaughlin interviewed with any connection to this matter was Mr. Dmochowski of Safeway.  Mr. Dmochowski neither confirmed any of Dr. McLaughlin's opinions nor supported Dr. McLaughlin's proposed testimony.  On the contrary, Mr. Dmochowski told Dr. McLaughlin that his opinion of Plaintiff was *based on other completely independent factors* than ones Plaintiff alleges – namely, that the owners and senior executives of Plaintiff were "*bizarre to deal with.*" (McLaughlin Dep. at 167; 257; 347-47) (emphasis added).  Ignoring Mr. Dmochowski's answers and relying on his experience, Dr. McLaughlin concluded that Defendants might have caused Plaintiff's damages.

The Court finds that Mr. Dmochowski demonstrated an example of what *actually* happened.  In addition to Mr. Dmochowski, other CPG interviewees similarly stated that they would not leave their current vendor simply because a competing vendor made negative comments about the CPGs current vendor.  *See* Exhibit 1063 at FGI 220973, 220992-93 (Ed Porter of Stop and Shop stating that "Ed would check negative info himself but this doesn't happen too much.  Would question first vendor integrity"); FGI 220988 (notes from interview of Joe Sheridan of Wakefern, stating that "[v]endors rarely offer negative information about a supplier.  Such practice would only look unprofessional for the vendor"); FGI 220991-92 (notes from interview of Ken Shields of Procter and Gamble, stating that "'[n]egative sell' doesn't work"); FGI 220985-85 (notes from interview with Tim LeBeau of Drug Fair, stating that "bashing is uncommon . . . plus risky strategy for basher . . ."); *and* FGI 220990 (notes from

interview of Chris Linskey of ADVO, stating that "disseminating strictly negative information is very rare in most sales and marketing channels . . .").

Plaintiff argues that Dr. McLaughlin's testimony is admissible based upon his vast experience of the in-store marketing industry and that the survey played a minor role in his analysis. (Pl.'s McLaughlin Opp. Br. at 2.) Plaintiff cites to *Betterbox Communications Ltd. v. BB Technologies, Inc.*, 300 F.3d 325 (3d Cir. 2002), claiming that the Third Circuit affirmed the district court's admission of a marketing expert's testimony who had "informally surveyed colleagues." (Pl.'s McLaughlin Opp. Br. at 2.) The Court disagrees with Plaintiff's reading of *Betterbox*. The Court reads *Betterbox* to stand for the proposition that the district court's admission of testimony from an expert who conducted interviews was harmless error, and expressly declined to reach the issue of whether the district court properly admitted the expert's testimony. *Betterbox*, 300 F.3d at 329.

The Court finds that Plaintiff seeks to introduce the testimony of Dr. McLaughlin as a substitute for the direct testimony of individuals who have first hand knowledge of the events at issue. *See, e.g.*, *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469-70 (S.D.N.Y. 2005) (excluding proposed expert's speculation regarding "the state of mind and motivations of certain parties who were involved in the relevant transaction, often without citation to any record evidence" on that ground that "[i]nferences about the intent or motive of parties or others lie outside the bounds of expert testimony").

Despite Plaintiff's arguments that Dr. McLaughlin's interview techniques were not a formal survey but rather a series of "executive interviews", the Court finds that they are nonetheless inadmissible. There are well established principles to determine whether a survey is

based on the "methods and procedures of science." *In re Paoli R.R. Yard. PCB Litig.*, 35 F.3d at

742.  A survey "must be conducted with proper safeguards to insure accuracy and reliability."

*Pittsburgh Press Club v. United States*, 579 F.2d 751, 755-59 (3d Cir. 1978).  These include the

following: (1) a proper universe must be examined and a representative sample must be chosen;

(2) the persons conducting the surveys must be experts; (3) the data must be properly gathered

and accurately reported; (4) the sample design, the questionnaires and the manner of interviewing

[must] meet the standards of objective surveying and statistical techniques; (5) the survey must

be conducted independently of the attorneys involves in the litigation; and (6) the interviewers . .

. ideally should be unaware of the purposes of the survey or litigation.  *See id.* at 578.

　　　The validity of a survey's results is undermined if the sample is not representative of the

population that it purports to represent *or is not selected in a sufficiently random manner.*"  *U.S.*

*Parcel Services, Inc. v. U.S. Postal Service*, 184 F.3d 827, 840 n. 14 (D.C. Cir. 1999) (emphasis

added).  Similarly, the Federal Judicial Center Reference *Manual* cautions that interviewers

"should be instructed to record verbatim the respondent's answers."  *See* Federal Judicial Center,

REFERENCE MANUAL 264-65 (2d ed. 2000).  Here, Dr. McLaughlin knew or was referred to each

of the twenty-eight interviewees.  In fact, one of the interviewees, Ann Raider, has a lawsuit

pending against Defendant in another federal district court.[8]  Moreover, Dr. McLaughlin knew

that Plaintiff was the sponsor of the survey.  (Def.s' McLaughlin Br. at 17.)  Further, Dr.

McLaughlin failed to observe the verbatim reporting protocol for valid survey research.

Specifically, he neither recorded the responses to his question nor the questions themselves.  *See*

_____

　　　[8] *See Ann Raider v. News America Marketing In-Store*, Case No. 05-174, U.S. District
Court for the District of Massachusetts.

41

*id.* at 19.  He likewise admitted that the notes of his interviews were simply a summary of what the interviewees stated and were incomplete.  *Id.*; McLaughlin Dep. at 70; 307; 314.

Although Plaintiff's argument – that one can opine based upon experience – is true, such testimony must also explain how the experiences lead to the conclusion that is reached and why that experience is a sufficient basis for the opinion.  *See Daubert*, 43 F.3d at 1319.  More importantly, though, the expert must explain how that experience is reliably applied to the facts.  *Id.*  Simply stated, Dr. McLaughlin's testimony, and his explanation of his conclusions are not reliable, but rather entirely speculative.  *See* McLaughlin Rep. at 14 ("I *believe* that such negative information is *likely* to have caused considerable damage to [Plaintiff's] reputation. . .") (emphasis added).

In sum, since causation must be demonstrated in this case by showing that decision-makers at the relevant CPGs and retailers were actually influenced by the alleged Defendants' misconduct – not by showing that certain unidentified individuals may have been influenced by alleged misconduct – Dr. McLaughlin's testimony is inadmissible.  Although "executive interviewing" may be an acceptable method of gathering information in the in-store marketing industry, it is not an acceptable methodology in a federal court of law, at least not as presented here.  Therefore, Defendants' motion to preclude Dr. McLaughlin's testimony is granted.

G.    Willard Bishop

The testimony of Willard Bishop fails to meet Rule 702 because Dr. Bishop failed to provide a permissible methodology.  The Court further finds that although he has the necessary qualifications to issue a report, his testimony is both cumulative and unreliable.

Defendants seek to exclude the expert testimony of Dr. Willard Bishop on the grounds

42

that (1) he failed to employ an acceptable methodology for reaching his conclusions, (2) the probative value of his testimony is substantially outweighed by the prejudice to News America pursuant to Rule 403, and (3) in the event that Dr. McLaughlin's report is excluded, Dr. Bishop's report would have no independent relevance.

On the other hand, Plaintiff argues that Defendants' motion should be denied because Dr. Bishop is a rebuttal witness, specifically named pursuant to the June 25, 2007 Court Order permitting Plaintiff to name an additional expert "in response to Dr. Ericksen". (*See* June 25, 2007 Order at 2.)  Plaintiffs argue Dr. Bishop's methodology is reliable, and that Dr. Bishop's testimony will help jurors understand the reliability of Dr. McLaughlin's report in the "face of a baseless attack from Defendants' expert, Dr. Ericksen."  (Pl.'s Bishop Opp. Br. at 1-2.) Furthermore, Plaintiff argues that Dr. Bishop will also provide an industry-specific perspective that Dr. Ericksen admits he lacks.  *Id.* at 2.  Plaintiff states that Dr. Bishop has been a "highly-regarded expert in the food marketing industry for the last thirty-five (35) years."  *Id.* at 2. Defendant does not challenge Dr. Bishop's qualifications.

At the outset, the Court finds that Dr. Bishop's testimony is unhelpful to the trier of fact because the sole purpose of his analysis was to rehabilitate Dr. McLaughlin.  Since Dr. McLaughlin's testimony has been stricken, Dr. Bishop's testimony serves no helpful purpose to the jury.  Moreover, it would not be helpful to hear Dr. Bishop's interpretation of Dr. McLaughlin's work, especially in light of the fact that Dr. Bishop has not performed any independent research.  Dr. Bishop opines that Dr. McLaughlin's report is consistent with the "specialized knowledge that Dr. McLaughlin has accumulated in his field."  However, Rule 702 does not permit one side in litigation to place an expert opinion before the trier of fact without

43

providing the other side with a factual basis upon which to challenge the expert's assumptions, calculations, and conclusions.  *See Daubert*, 509 U.S. at 589-93.  Further, Dr. Bishop's opinion that the "accumulated impact of many inaccurate reports" led to a "likely refusal to these clients to enter into a new business venture with [Plaintiff]" neither took into account how many inaccurate reports there were nor the nature and extent of the inaccuracies within those reports. (*See* Bishop Rep. at 4.)

Plaintiff argues, on the other hand, that Defendants' own expert, Dr. Ericksen, failed to do any of his own independent research.  (*See* Pl.'s Bishop Opp. Br. at 10.)  Thus, if Dr. Bishop is precluded, then so must Dr. Ericksen be precluded.  The Court disagrees.  Dr. Bishop's testimony is not being precluded because he only reviewed three documents; rather, it is being precluded because Dr. Bishop's work is entirely derivative of Dr. McLaughlin's work.  Thus, since Dr. McLaughlin's testimony failed to meet the requirements of Rule 702, Dr. Bishop's work must also fail.  *See, e.g.*, *Robert S. v. Stetson School, Inc.*, 256 F.3d 159, 170 (3d Cir. 2001) (holding that trial court did not abuse its discretion in excluding expert testimony where the expert "addressed the same issues" as another witness).[9]

Even if Dr. McLaughlin's testimony were permitted, Dr. Bishop's testimony does not meet the requirements of Rule 702.  The Court notes that Dr. Bishop is an extremely well educated and qualified professional, but his explanation of Dr. McLaughlin's methodology is unreliable in a federal court.

Dr. Bishop, who has known Dr. McLaughlin for twenty-five years, stated that he "formed

---

[9] Although there is no motion before the Court, it would seem apparent that because Dr. McLaughlin's opinion is precluded, Dr. Bishop's opinion, at least as it relates to Dr. McLaughlin's opinion, would be irrelevant.

[his] opinions for this case based on [his] prior experience and understanding of [Dr.
McLaughlin's] knowledge and capabilities and [his] confidence in them."  (Bishop Dep. at 105-
06.)  During Dr. Bishop's deposition, he repeatedly stressed his admiration for Dr. McLaughlin
and his work.  *Id.* at 81-82.  Dr. Bishop even went so far as to say that the specifics of Dr.
McLaughlin's "survey instrument" were irrelevant and that his evaluation of Dr. McLaughlin's
work reflected his admiration for his friend and colleague.  (*See* Def.s' Bishop Reply Br. at 4.)
Specifically, he stated that "the primary method for doing [survey interviews properly] would be
to make a judgment on Dr. McLaughlin's integrity."  (Bishop Dep. at 125; 155 (testifying that he
"personally [has] confidence in the – both the experience and the integrity of Dr. McLaughlin to
carry out that assignment objectively"); 105 (Dr. Bishop has a "strong appreciation" for Dr.
McLaughlin's "talents").)  Indeed, Dr. Bishop stated that if the "executive interviewing" had
been undertaken by anyone other than Dr. McLaughlin, Dr. Bishop would "definitely need
additional information to form the kind of opinion [he] was able to form here based on prior
experience."  *Id.* at 106.

     Here, while the Court respects the regard and admiration that Dr. Bishop has for Dr.
McLaughlin, and indeed shares that same regard and admiration, it cannot be a basis for the
Court's decision in whether someone is a qualified expert.  Although expert testimony can be
admitted based on relevant experience, there needs to be some objective and verifiable indicia of
reliability and relevance.  Dr. Bishop provides the Court with no additional information and no
independent analysis other than his respect for Dr. McLaughlin and his work.  As the Seventh
Circuit Court of Appeals stated, "an expert who supplies nothing but a bottom line supplies
nothing of value to the judicial process."  *See Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th

Cir. 1996).  Dr. Bishop is supplying us the same bottom line as Dr. McLaughlin – that (1) executive interviewing is an acceptable methodology and (2) Dr. McLaughlin's testimony was proper – without providing any basis for those opinions.  As such, Defendants' motion to preclude Dr. Bishop's testimony is granted.

        H.        <u>Federal Rule of Evidence 403</u>

In each of its motions, Defendants argue that the Court should preclude Plaintiff's experts' testimony on the basis of Federal Rule of Evidence 403, which states that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Specifically, Defendants state that "[p]ermitting [an expert] witness to offer an opinion unsupported by a sufficient factual foundation would significantly increase the risk of misleading the jury and confusing the issues, the very dangers of which Rule 403 defends."  *Elcock*, 233 F.3d at 756 n. 13.

Here, the Court finds that both Dr. McLaughlin and Dr. Bishop's testimonies are substantially outweighed by the danger of unfair prejudice or confusion of the issues for the jury. For the other experts, however, the Court finds that the probative value substantially outweighs any prejudicial effect.  In fact, the Court finds that the testimony of the other experts will aide the jury in understanding the complex issues of this case and assist them in their efforts of arriving at a fair resolution of the issues in this case.

**IV.**    **CONCLUSION**

For the reasons stated above, Defendants' motions to preclude the trial testimonies and reports of Edward McLaughlin and Willard Bishop are granted.  However, Defendants' motions to preclude the testimonies and reports of Luke Cats, William Carrington, Paul Farris, and John Wills are denied.  An appropriate Order accompanies this Memorandum Opinion.

**DATED: February 4, 2008**